### Thomas C. Murphy and Carol A. Presley v. Stowe Club Highlands, Robinson Springs Partnership, and Robinson Springs Corporation

[761 A.2d 688]

Nos. 98-263, 99-019 & 99-032

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed June 23, 2000

Motion for Reargument Denied August 21, 2000

*Russell D. Barr* and *William L. Durrell* of *Barr & Associates,* Stowe, for Plaintiffs-Appellees (98-263) Appellants (99-019 & 99-032).

*Douglas C. Pierson* and *Thomas M. Higgins* of *Pierson, Wadhams, Quinn & Yates,* Burlington, and *Thomas J. Amidon,* Stowe, for Defendants-Appellants (98-263) Appellees (99-019 & 99-032).

**Dooley, J.** Defendants Stowe Club Highlands, Robinson Springs Partnership, and Robinson Springs Corp. appeal from a jury verdict finding them liable to plaintiffs Thomas Murphy and Carol Presley for breach of contract and awarding them $53,000 in compensatory and $100,000 in punitive damages. The verdicts result from the jury's finding that defendants breached a contractual obligation to perform site work, called "dirt work," on plaintiffs' lot in preparation for plaintiffs building a house on the lot. Defendants also appeal from a jury verdict in their favor on their counterclaim for conversion of gravel because the jury awarded them no damages. Defendants make four arguments on appeal: (1) the trial court erred in ruling that plaintiffs' recovery was not limited to receipt of $5,000 placed in escrow by the parties; (2) there was no basis for a punitive damage award; (3) the compensatory damage award was excessive and not justified; and (4) the failure to award damages on defendants' counterclaim was inconsistent with the jury instructions. Plaintiffs, in turn, appeal (1) the denial of their motion for attorneys' fees, and (2) the granting of defendants' motion to post a corporate surety bond in lieu of attachments. The appeals were consolidated for review. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

In July 1994, plaintiffs, husband and wife, as buyers and defendants as sellers[1] signed a purchase and sales contract for lot #31 in Stowe Club Highlands, a residential development. Attached to the purchase

---

[1] Plaintiffs signed their contract with Robinson Springs Partnership (RSP). The partners in RSP are Robinson Springs Corporation and 232511 Investments, Ltd., a Canadian company. 232511 Investments, Ltd. does business in Vermont under the name Stowe Club Highlands. Apparently, RSP became insolvent shortly after plaintiffs purchased their lot, and the development was continued by its partners.

and sales contract was an addendum containing "special conditions." One of these conditions provided that defendants would perform "all 'dirt work' necessary for the construction of the house on lot #31." This work was to include: "Excavation and backfill of cellar hole . . . and trenches for water, electric, cable TV, telephone and septic lines . . . installation of driveway . . . removal and/or burial of stumps and debris created by reason of the dirt work . . . final grading around house, retaining walls as necessary, rake, seed and mulch." The condition also provided that the work was to be completed to the satisfaction of the buyers, and another condition specified that the parties would enter into a separate escrow agreement "for the purpose of escrowing $5,000 pending completion of the work detailed [in the other condition]."

The parties entered into an escrow agreement at the closing on September 26, 1994. It recites substantially the same list of dirt work to be performed by defendants, and also provides that all items other than the final grading around the house, the installing of any retaining walls, and the raking, seeding, and mulching were to be completed no later than December 31, 1995, or the escrow fund would be released to plaintiffs. Pursuant to the agreement, $5,000 was deposited in the escrow account, held by plaintiffs' lawyer.

Virtually no activity occurred with respect to the site until the summer of 1995, apparently because plaintiffs were trying to sell their existing house. When plaintiffs bought lot #31, it contained a rough driveway allowing entry onto the land from the access road. During the summer of 1995, almost a year after the closing, defendants performed work on the lot, adding gravel to the rough driveway, and creating a "stump dump" to bury stumps and water bars to control erosion. The stump dump was created by digging a hole in the lot, pushing a number of tree stumps into it, and covering them with dirt to create a mound. There was conflicting evidence about whether the stumps came from plaintiffs' lot or from neighboring lots. In July 1995, plaintiffs visited the site, discovered the stump dump and water bars, and told James Connacher, President of Stowe Club Highlands, that they were displeased with the condition of the land.

Disputes arose between the parties, with Mr. Connacher representing defendants. Plaintiffs decided that the existing access to the lot was not suitable for a driveway, and informed defendants in late

---

Throughout the case, the defendants have been treated together, without differentiating their conduct or liability. Thus, we have not differentiated their liability.

October or early November 1995 where they wanted the access relocated. As Mr. Connacher learned of the work plaintiffs were expecting of him under the purchase and sale contract, he grew concerned about the cost and told plaintiffs that they needed to work out a new dirt work agreement to spell out in detail the work that would be done. Plaintiffs were unwilling to enter into a new agreement. Earlier, Mr. Connacher had recommended an excavation contractor to plaintiffs. At some point in late 1995 or early 1996, he told that excavation contractor not to do any work for plaintiffs, causing a delay while they arranged another contractor.

Pursuant to its Act 250 permit and as part of the mutual covenants between landowners in the development, the Stowe Club Highlands development has an architectural review committee, which must review and approve all building and landscape designs prior to development of a lot. To obtain preliminary and then final approval, the landowner must present: (1) preliminary plans showing "proposed location, preliminary elevations, shape and dimensions of the proposed improvements," and (2) final plans including a "site plan, a foundation plan, working drawings for the proposed improvements, . . . elevations, and the landscape plan." The committee has 30 days to respond to requests for approval.

In the fall of 1995, the members of the architectural review committee included an architect, a resident of Stowe Club Highlands, and a representative of one of the owners of the development, Mr. Connacher. At trial, plaintiff Murphy testified that Mr. Connacher stated at a site meeting that all plaintiffs needed to submit to the architectural review committee were exterior elevations and outside finishes. Plaintiffs' evidence also showed that a previous review by the committee had taken about a week and had been very informal.

On November 22, 1995, plaintiffs gave their preliminary plans to the architectural review committee, hoping to start construction before the winter. Although their designer had substantially completed the construction plans by that date, the submission consisted only of exterior elevations, color swatches, and a computer rendering of the exterior. On December 19, 1995, the committee informed plaintiffs that their submission was incomplete and that they were required to submit interior floor plans and a revised site plan in accordance with the covenants before their proposal could be considered. Plaintiffs responded by letter stating they had submitted everything Mr. Connacher had told them to submit, and asking again for prompt approval. When they received no immediate response,

they contacted their attorney. Plaintiffs' attorney wrote a letter to Mr. Connacher on their behalf on December 29, 1995, demanding that he complete the dirt work and stating that the escrow money would not be released at the end of the year. Plaintiffs did not start construction that winter.

In March and April 1996, plaintiffs submitted most of the needed plans, and on April 5, 1996, the architectural review committee issued preliminary approval of the plans. On May 10, 1996, the committee gave final approval to the plans for the house,[2] and plaintiffs began construction, hiring their own contractor to perform the dirt work. Plaintiffs' excavation contractor used some gravel from piles belonging to defendants. Construction was not completed within the two-year limit required to avoid a land gains tax, and plaintiffs paid a tax of $19,000.[3]

The legal battle between the parties continued, however. Plaintiffs' attorney, not having received a response to the December letter, sent a letter to Mr. Connacher in March 1996, demanding immediate action to complete the dirt work and to remove the stump dump and water bars and accusing him of manipulating the architectural review process to avoid performing the dirt work. Through counsel, defendants responded that the dirt work obligation had not survived closing because it was not in the deed, no dirt work could be performed until plaintiffs obtained approval from the architectural review committee, Mr. Connacher had abstained from deliberations of the committee, and plaintiffs' counsel could release the escrow money to plaintiffs. Further letters only escalated the controversy, and this suit was filed in August 1996.

The complaint charged defendants with violating the Vermont Consumer Fraud Act; trespassing on lot #31 when they entered onto it in July 1995 to create the stump dump and water bars; negligence in the creation of the stump dump and water bars; and breach of contract for failing to complete the dirt work specified in the purchase and sale and escrow agreements. Included in the relief requested

---

[2] The landscape plans apparently never received final approval.

[3] The land gains tax is imposed on the transferor, 32 V.S.A. § 10006, and the purchase and sales contract in this case specified that the seller was to pay any land gains tax. However, there is no tax with respect to land on which a purchaser's principal residence will be completed and occupied within two years after the transfer. Id. § 10002(b). In such a case, the purchaser certifies the residence will be constructed and occupied within two years, and no tax is paid at the time of transfer. Id. § 10006. Should the representation turn out to be incorrect, as in this case, the transferee becomes obligated to pay the tax. Id.

were attorneys' fees pursuant to the Vermont Consumer Fraud Act, and punitive damages. Defendants filed a counterclaim for conversion of the gravel used by plaintiffs' contractor.

Following a five-day trial, the jury found that defendants breached their contractual obligations to plaintiffs, but were not negligent and did not trespass on lot #31. The jury also found plaintiffs converted some of defendants' gravel, but did not assign any damages to that claim. The jury verdict awarded plaintiffs $58,000 in compensatory damages, minus the $5,000 already received from the escrow agreement, and $100,000 in punitive damages, for a total of $153,000. Defendants appealed from the judgment entered on that verdict.

After judgment was entered, writs of attachment against defendants' real property were issued and recorded in the Stowe land records. On June 4, 1998, defendants filed a motion to substitute collateral. The court granted the motion to substitute a surety bond in lieu of the writs of attachment, and plaintiffs have appealed that decision.

During the same time period, after judgment was entered, plaintiffs moved for imposition of attorneys' fees pursuant to V.R.C.P. 54(d)(2)(A). That motion was denied, and plaintiffs have appealed that decision as well. We begin with defendants' appeal issues.

## I.

### A.

Defendants first argue that when defendants defaulted, plaintiffs' sole remedy was to retain the $5,000 held in escrow and, therefore, the entire damage award must be reversed. Defendants raised this argument in a summary judgment motion filed at the beginning of the trial. They claimed that the escrow agreement was a liquidated damages clause, limiting plaintiffs' remedy to the $5,000 escrow amount. The court ruled that the escrow amount represented security for defendants' obligation contained in the purchase and sales contract, and that contract, not the escrow contract, represented the statement of defendants' obligation. Defendants argue here that the court's ruling was erroneous.

As set forth above, the purchase and sale contract was signed in July 1994. In a special condition annexed to the contract, defendants obligated themselves to "provide all 'dirt work' necessary for the construction of [plaintiffs'] house," and this work was "to be completed to the satisfaction of the Buyers." The condition detailed the

"dirt work" covered by the agreement. Another condition required the parties to enter into an escrow agreement to escrow "$5,000 pending completion of the work detailed" in the condition above. As discussed below, the main purchase and sale contract set out the remedies in case of breach by either party.

At closing on September 26, 1994, the parties signed an escrow agreement, escrowing $5,000 of the purchase price with plaintiffs' closing lawyer, "to provide assurance that the unfinished work will be completed by" the sellers. The escrow agreement contained the same list of dirt work to be done by defendants. It provided that most of the dirt work was to be completed by December 31, 1995, with the remainder to be completed by the end of the following year. If the sellers did not complete the work by the specified date, the amount necessary to complete the work was to be released to the buyer for that purpose. If the sellers completed the work, the escrow fund was to be distributed to them.

In their summary judgment motion, defendants first claimed that the obligations contained in the purchase and sales contract were merged into the deed at closing, and because the deed did not contain the dirt work obligation, it did not survive. The court correctly rejected this argument. Although some purchase and sales provisions may merge into the deed on closing, collateral provisions and those not performed before delivery and acceptance of the deed do not merge. See *Wyatt v. Palmer*, 165 Vt. 600, 601-02, 683 A.2d 1353, 1356 (1996) (provisions of purchase and sale contract establishing seller's duty to build a house for buyers not merged into deed); *Chappell v. Northern Realty, Inc.*, 128 Vt. 476, 480, 266 A.2d 453, 456 (1970) (obligation to repair in purchase and sales agreement enforceable; it "does not in any way affect the deed or impair its force or effect," rather it is "collateral to it and independent of it"); *Pepin v. Poitras*, 127 Vt. 307, 309, 248 A.2d 719, 720 (1968) (purchaser's acceptance of unconditional deed did not nullify terms of sales contract providing that seller would make cellar usable against problems created by spring under it; terms of deed and sales contract were not "inconsistent or in conflict with each other").

Defendants' second argument is that the escrow agreement superseded and extinguished the purchase and sales contract. The trial court ruled that the escrow agreement was only supplementary to the purchase and sales contract, and that both contracts remained in effect. Again, we believe that the trial court ruled correctly. See *Cooperative Fire Ins. Ass'n of Vermont v. Bizon*, 166 Vt. 326, 333, 693

A.2d 722, 727 (1997) ("As long as the trial court's construction of the contract is reasonable, we will sustain it.").

"The purpose of an escrow is to assure the carrying out of an obligation already contracted for and in furtherance of the obligation the promisor deposits money, goods, or documents to an escrow agent who agrees to part with it only on a specified condition." *National Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn*, 634 N.Y.S.2d 609, 614 (Sup. Ct. 1994). By its very nature, an escrow agreement is supplementary to another contract. Indeed, there must exist a binding underlying contract "or the escrow instructions are unenforceable." *Allan v. Martin*, 574 P.2d 457, 458 (Ariz. 1978):

> Therefore, the escrow instructions are not a part of the underlying real estate sales contract and the terms of the instructions cannot alter or modify the sales contract unless the parties specifically and clearly state such alteration or modification in writing with specific reference to the fact it changes the original contract.

*Id.*; see also *Angle v. Marco Builders, Inc.*, 626 P.2d 126, 129 (Ariz. 1981).

■ There is no reference in the escrow agreement in this case to suggest it modifies the purchase and sales contract, and no other indication of such an intent. The purchase and sales contract specifically provided that the parties would enter into an escrow agreement at closing. Nothing in the escrow agreement states or implies that the escrow agreement was intended to supersede provisions of the purchase and sales contract.

By similar reasoning, we resolve defendants' third and most important argument on this issue. Defendants argue that the escrow agreement should be read as creating a liquidated damages provision and limiting plaintiffs' damages to the escrow amount. We agree that the parties could have designated the escrow amount as liquidated damages and limited plaintiffs' damages to the escrow amount. See, e.g., *Renaudette v. Barrett Trucking Co.*, 167 Vt. 634, 636, 712 A.2d 387, 389 (1998) (mem.) (upholding liquidated damages provision, limiting damages to escrowed amount). We must, however, construe contracts to give effect to the intent of the parties as that intent is expressed in their writings. See *Hamelin v. Simpson Paper Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). Unless a contract provision is ambiguous, we construe it as a matter of law. See *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 581, 556 A.2d 81, 85 (1988). We will,

however, sustain the trial court's construction of a contract if it is reasonable. *Bizon*, 166 Vt. at 333, 693 A.2d at 727.

To reach the conclusion defendants urge, we must find in the contracts that the parties expressed an intent to use the escrow amount as liquidated damages. The writings before us are devoid of any such intent. The main body of the purchase and sales contract has a section entitled default. That section allows the seller to retain any deposit as liquidated damages should the buyer fail to close the transaction or otherwise default. It also provides that if the seller fails to close or "is otherwise in default," the purchaser may terminate the contract and "may pursue Purchaser's rights to all legal and equitable remedies provided by law." It contains no language providing liquid damages to the purchaser.

The special conditions to the contract which were added in part to set forth the dirt work obligation provide only that the parties "shall enter into an escrow agreement for the purpose of escrowing $5,000 pending completion of the work detailed" in the dirt work provision. As we held above, the escrow agreement does not supersede the purchase and sales agreement. Nevertheless, if we look to the escrow agreement, we find in it no expression of intent consistent with defendants' argument. The escrow agreement says that the "escrow fund is to provide assurance that the unfinished work will be completed by SELLER" and also that upon failure of defendants to perform the work, the escrow amount is to be released to plaintiffs "for their use in making alternative arrangements for completion of the work."

Neither agreement relates delivery of the escrow amount to any other remedies plaintiffs may have. Indeed, the purchase and sales contract specifically provides that plaintiffs have all legal and equitable remedies provided by law. Neither agreement states or suggests that the delivery of the escrow amount is the exclusive remedy for defendants' breach of the dirt work obligation. In the absence of such provisions, we cannot construe the purchase and sales contract as limiting plaintiffs' remedies to retention of the escrow amount, or establishing the escrow amount as liquidated damages. See *David v. Hitti*, 480 P.2d 581, 583-84 (Col. Ct. App. 1970) (where neither partnership dissolution agreement or escrow agreement related delivery of escrow to seller's remedies or stated delivery of escrow property was seller's sole remedy, seller retained right to sue for damages for breach of the dissolution agreement).

## B.

■ Defendants' next claim is that the trial court erred in submitting plaintiffs' demand for punitive damages to the jury. Before we examine the merits of this claim, we must first address plaintiffs' response that defendants failed to preserve this argument because they failed to object to the jury instructions on punitive damages following their delivery to the jury as required by V.R.C.P. 51(b). In this case, defendants sought a judgment as a matter of law on the punitive damages issue in compliance with V.R.C.P. 50(a), and renewed their motion after entry of judgment as required by Rule 50(b). These motions preserved the issue for appellate review, whether or not defendants also objected to the jury instruction. See *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 290-91, 576 A.2d 441, 445 (1990).

The method of preservation also provides the standard of review. We must determine whether the result reached by the jury is sound in law on the evidence produced. See *Haynes v. Golub Corp.*, 166 Vt. 228, 233, 692 A.2d 377, 380 (1997). In making this determination, we must view the evidence in the light most favorable to the nonmoving party, and exclude the effect of any modifying evidence. See *id.*

In this Court, and before the jury, plaintiffs urged three main justifications for punitive damages: (1) defendants flagrantly refused to discharge their responsibility to perform the dirt work for plaintiffs' house, and gave spurious and legally misleading reasons why they were not performing; (2) defendants directed the dirt work contractor not to perform the dirt work for plaintiffs; and (3) defendants manipulated the architectural approval process to delay approval so they would be released from their obligation to perform the dirt work. In evaluating whether these justifications are sufficient, we must examine our decisions on punitive damages in breach of contract cases.

The leading modern case is *Clarendon Mobile Home Sales, Inc. v. Fitzgerald*, 135 Vt. 594, 381 A.2d 1063 (1977), in which the landlord of a mobile home lot sued for possession and back rent and the tenants counterclaimed for damages, including punitive damages, for breach of the warranty of habitability. On the punitive damages issue, we held:

> Punitive damages are generally not recoverable in actions
> for breach of contract. However, in certain extraordinary
> cases in which the breach has the character of a wilful and

wanton or fraudulent tort, punitive damages may be al-
lowed. Punitive damages are awarded not as compensation
to the sufferer, but "on account of the bad spirit and wrong
intention" of the breachor.

*Id.* at 596, 381 A.2d at 1065 (citations omitted).

Later cases have provided a fuller explanation of the standard. In
*Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 592 A.2d
871 (1991), plaintiff sought punitive damages because of defendant's
refusal to provide severance benefits, as contracted, after it fired
plaintiff. We explained that *Clarendon Mobile Homes* required that
the breach of contract have the "character" of a tort, but not
necessarily all the elements of an independent tort. See *Ainsworth*,
156 Vt. at 331-32, 592 A.2d at 874-75. We also defined the actual malice
required for an award of punitive damages in any case:

Malice is shown by "conduct manifesting personal ill will,
evidencing insult or oppression, or showing a reckless or
wanton disregard of plaintiff's rights." Malice may be
inferred from the nature of defendant's conduct and the
surrounding circumstances.

*Id.* at 332, 592 A.2d at 875 (citation omitted).

■ Plaintiffs' main argument in support of the punitive damages
award is that they showed that defendants acted with reckless or
wanton disregard of their rights, and that their showing was sufficient
under *Ainsworth*. However, even if plaintiffs' evidence was sufficient
to show malice, malice alone is not sufficient to support an award of
punitive damages in a breach of contract case. Defendants' actions
must also be akin to a willful and wanton, or fraudulent, tort.

Our cases upholding the award of punitive damages based on a
breach of contract are helpful in demonstrating the tortious character
element. In *Ainsworth*, the plaintiff worked as manager of the
defendant's cheese plant. The defendant's president fired him without
explanation and induced him to train a replacement and update files
on research and development. Only thereafter did the defendant's
president disclose in writing that the firing was for specific cause and
invoke an employment contract provision that allowed the defendant
to deny the plaintiff severance benefits in the case of a termination for
cause. We upheld an award of punitive damages because the defend-
ant's president had fabricated grounds for termination to deny
severance benefits and did so only after the "plaintiff had worked in

good faith to finish up his work and turn over his position to a new manager." *Id.* at 332, 592 A.2d at 875.

The circumstances of *Appropriate Technology Corp. v. Palma*, 146 Vt. 643, 508 A.2d 724 (1986), are similar. The defendant worked for the plaintiff for a promise of payment in stock and a very low salary because the corporation was undercapitalized, and quit under family financial pressures. Unknown to the defendant, the plaintiff's president received a substantial capital contribution to the corporation and intentionally failed to disclose it to defendant. The defendant brought a counterclaim for the value of the promised stock, and was awarded punitive damages. We affirmed because the "president knowingly misrepresented [plaintiff's] finances, and that . . . misrepresentation induced defendant to leave the corporation's employ." *Id.* at 648, 508 A.2d at 727. See also *Glidden v. Skinner*, 142 Vt. 644, 647-48, 458 A.2d 1142, 1144-45 (1983) (in action based on breach of contract to sell defendants' farm to plaintiffs, punitive damages warranted because defendants induced plaintiffs to sell cows from another farm and work long hours on defendants' farm without compensation, even though defendants knew they would not go through with sale).

We find that none of plaintiffs' theories of why punitive damages were appropriate meet the standards as developed in our case law. With respect to the first theory, it appears that defendants failed to respond to demand letters, initially from plaintiffs and then from their attorney, and when they finally responded through counsel, the responses were misleading and inaccurate. We accept plaintiffs' description of defendants' conduct as trying to find any way possible to avoid their responsibilities under the purchase and sales contract. However, whatever reasons defendants gave for nonperformance, we do not believe letters between counsel have the character of tortious conduct, and they did not induce any action in reliance by plaintiffs. Moreover, although we have resolved the contract construction issues in favor of plaintiffs, we do not view as frivolous defendants' claim that their liability was limited to the amount of the escrow agreement.

The second theory is tied in with the third because the architectural review process became the controlling reason for the delay, and dirt work could not commence until architectural approval was obtained. The third theory is stronger because fraudulent conduct is alleged. Even viewing the evidence most favorably to plaintiffs, however, we cannot find proof sufficient to warrant punitive damages. It is undisputed that the architectural review committee acted consistent

with the covenants that controlled the construction of houses within the Stowe Club development, and there is no direct evidence that the committee delayed the review process to aid defendants. At best, plaintiffs' evidence showed that covenant requirements were waived in one or more prior instances, and were not waived in this case, and that defendants' agent misled plaintiffs into believing a more perfunctory review was the norm. However, because plaintiffs assert they had the plans needed for full review, it is difficult to see how the representations about the scope of the review process made a difference. In any event, we do not believe that plaintiffs' evidence was sufficient to show malicious conduct akin to a tort. See *Ainsworth*, 156 Vt. at 331-32, 592 A.2d at 874-75.

In evaluating this claim, we are also influenced by the fact that plaintiffs' theory about why the review process was delayed is not consistent with the contracts. Again, there is no direct evidence that defendants were seeking to delay progress beyond December 31, 1995 as a way of avoiding all responsibility to perform the dirt work. Delaying review beyond December 31, 1995 arguably might have created a bar to release of the escrow amount to plaintiffs, but defendants did not contest that plaintiffs were entitled to the escrow amount. Thus, plaintiffs' punitive damages theory is that defendants delayed plaintiffs' progress to get beyond a date that is meaningless to the dispute between the parties.

██ We cannot conclude that the decision to award punitive damages was "sound on the law." Therefore, we strike the punitive damages award.

## C.

Defendants next argue that the compensatory damage award is not supported by the evidence. Plaintiffs claimed damages in three categories: (1) the cost of the work defendants should have performed under the purchase and sales contract; (2) the cost of removing the stump dumps and water bars; and (3) the land gains tax plaintiffs were obligated to pay because the residence was not built in time to avoid it. Although plaintiffs also sought damages for the second category under their negligence and trespass theories, the court charged that the costs of removing the stump dump could be considered contract damages if the jury found that the stump dumps

were not authorized by the contract or were not created in a good workmanlike manner.[4]

The measure of damages is:

> "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform."

*McGee Constr. Co. v. Neshobe Development, Inc.*, 156 Vt. 550, 557, 594 A.2d 415, 419 (1991) (quoting Restatement (Second) of Contracts § 347 (1981)). Plaintiffs' evidence supported an award in excess of $100,000, but the jury awarded $58,000 and subtracted the $5,000 plaintiffs received from the escrow for a final award of $53,000.

■ On appeal defendants contest in particular the various amounts plaintiffs sought for dirt work, claiming what was done far exceeded what defendants were obligated to do under the purchase and sales contract provision. The trial judge charged the jury on the standards it had to apply in determining what damages to award, and defendants raised no objection to the wording of the charge. Presumably, the jury performed exactly the function defendants desired of it. It listened to plaintiffs' damages evidence and found that some of the claimed amount was attributable to defendants' breach of contract, and some was not. As we noted in a similar construction case, "this was a case in which the jury could reach virtually any amount within very wide limits." *Retrovest Assocs., Inc. v. Bryant*, 153 Vt. 493, 498, 573 A.2d 281, 284 (1990). We must view the evidence in the light most favorable to the damages found by the jury and uphold the award if there was evidence reasonably supporting it. See *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 144, 636 A.2d 744, 753 (1993). The jury's compensatory damages award was within the wide limits supported by the evidence.

---

[4] Although the court did not specifically mention the water bars in the charge language, its general language was broad enough for the jury to find that the cost of removing the water bars was an item of damage for breach of contract.

## D.

Finally, defendants argue that the jury erred in awarding no damages on their counterclaim for conversion of gravel. The jury found that plaintiffs had improperly converted gravel from piles that were placed across the road from plaintiffs' land on land owned by defendants. Plaintiffs acknowledged that they took some gravel for site work on their property, but argued that they had a right to take the gravel because of defendants' obligation under the dirt work provision and minimized the amount taken.

We cannot determine the jury's reasons for its actions under the interrogatories they answered. It is possible that they offset the value of the gravel against plaintiffs' damages, reflecting the value of a benefit provided by defendants to plaintiffs and the reduced cost of completing the dirt work. Consistent with the elements of damages set out in the Restatement (Second) of Contracts § 347, as adopted in *McGee*, 156 Vt. at 557, 594 A.2d at 419, that would have been a reasonable approach for the jury to use in calculating damages. Plaintiffs' rebuttal argument to the jury appears to have encouraged the jury to view the circumstances in that manner. Ordinarily, we will not reverse a jury verdict if the jury could have reached that verdict in a proper manner, but might have reached it in an improper manner, because it is appellants' burden to show that actual error occurred. See *Lorrain v. Ryan*, 160 Vt. 202, 209-10, 628 A.2d 543, 548 (1993).

In this case, however, we do not believe we can uphold the verdict because the jury could have reached it in a proper way. The court did not fully charge the wording of the Restatement, and nothing in its charge suggests that the jury was to offset any benefit provided by defendants to plaintiffs, except for the escrow amount. More important, the court charged that if the jury found that plaintiffs converted the gravel, "you must award the defendants damages equal to the value of the gravel." The jury specifically found that plaintiffs were guilty of conversion. Thus, the benefit-offset theory was not consistent with the charge.

The evidence on the amount of gravel taken, and therefore its value, was disputed, and the jury had a wide range from which to chose. However, it could not under the charge choose to award no damages on the counterclaim once it found a conversion occurred. The proper remedy on remand is for the court to order an additur, representing a "reasonable amount" of damages consistent with the evidence. See V.R.C.P. 59(a); *Hoague v. Cota*, 140 Vt. 588, 593, 442

A.2d 1282, 1284 (1982); see also *Haynes*, 166 Vt. at 240, 692 A.2d at 384 (where Supreme Court finds damages excessive, remedy is to remand for trial court to order remittitur). If plaintiffs do not agree to pay the additur amount, the court must order a new trial on defendants' conversion damages.

## II.

### A.

Plaintiffs have appealed the trial court decision not to award attorneys' fees to them because they failed to submit the issue to the jury. Plaintiffs did not raise the issue of attorneys' fees either in their complaint or at trial. The first time they gave formal notice of their request was in a motion to the court for attorneys' fees and costs, filed fourteen days after the jury verdict. The court disallowed the attorneys' fee request, holding that attorneys' fees were an element of plaintiffs' damages for breach of contract and thus must be awarded by the jury, if at all. The court rejected plaintiffs' alternative argument that damages could be awarded under 9 V.S.A. § 4007(c), a section of the Construction Contract Act, because plaintiffs never raised that act at trial.

Plaintiffs' first ground for seeking attorneys' fees is the purchase and sales contract. Section 21 of that contract provides: "In the event legal action is instituted arising out of a breach of this contract, the prevailing party shall be entitled to reasonable attorney's fees and court costs." In seeking attorneys' fees by motion, plaintiffs relied upon V.R.C.P. 54(d)(2)(A), as added in 1996 to read:

> Claims for attorneys' fees for services rendered in con-
> nection with a pending action, and related nontaxable ex-
> penses, shall be made by motion in the action unless the
> applicable substantive law provides for the recovery of such
> fees as an element of damages to be proved at trial or in an
> independent action.

V.R.C.P. 54(d)(2)(A). The trial court held that Vermont substantive law provides that attorneys' fees to be recovered pursuant to a contractual provision must be recovered as an element of damages to be proved at trial. Accordingly, it held that Rule 54(d)(2)(A) could not be employed to authorize plaintiffs' motion for fees.

The trial court's holding is consistent with F.R.C.P. 54(d)(2)(A), from which our provision was derived. See Reporter's Notes to 1996

Amendment to V.R.C.P. 54 (subdivision (d) of Rule 54, as added in 1996, incorporates the 1993 addition of subdivision (d) to F.R.C.P. 54). The Advisory Committee Note to F.R.C.P. 54(d)(2)(A) explains the critical language of the rule as follows:

> As noted in subparagraph (A), it does not, however, apply to fees recoverable as an element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury.

A number of federal decisions have followed the analysis of the note and held that Rule 54(d)(2)(A) does not apply to attorneys' fees authorized by a contractual provision. See *Bordeaux Wine Locators, Inc. v. Albany Ins. Co.*, 1999 WL 401658, **3-4 (9th Cir. 1999); *Clarke v. Mindis Metals, Inc.*, 1996 WL 616677, **7-9 (6th Cir. 1996); *Allgood Elec. Co. v. Martin K. Eby Constr. Co.*, 179 F.R.D. 646, 647-48 (M.D. Ga. 1998).

We must, of course, decide what our own substantive law requires. Defendants argue that we decided this question in *Ianelli v. Standish*, 156. Vt. 386, 389, 592 A.2d 901, 903 (1991), but we disagree. The plaintiffs in *Ianelli* made the same argument accepted by the trial court in this case. The contract before the court, however, specified that the amount of the attorneys' fee was to be decided "by the court." We held that the language required adjudication by the court, and not the jury, and did not reach the argument that the question of fees should normally be determined by the jury. See *id.* We conclude that the question before us is one of first impression.

Despite the Advisory Committee Note to F.R.C.P. 54(d)(2)(A), we find that there is a split of authority on whether attorneys' fees are an element of damages in cases where the right to attorneys' fees is created by a contract. Some courts have held that a request for attorneys' fees must be included in the complaint and the entitlement and amount proven at trial. See *Stockman v. Downs*, 573 So. 2d 835, 837 (Fla. 1991); *Cross v. McCurry*, 859 S.W.2d 349, 353 (Tenn. Ct. App. 1993). Others have held that the request for attorneys' fees may be made by the prevailing party post-trial, and the decision on entitlement and amount is made by the court. See *Meadowbrook, LLC v. Flower*, 959 P.2d 115, 117 (Utah 1998). The United States Court of Appeals for the Second Circuit has held that the jury must decide whether a party is entitled to attorneys' fees pursuant to a contractual provision, but the amount of fees awarded is determined post-

trial by the judge. *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1315 (2d Cir. 1993). A number of federal courts have followed the Second Circuit approach. See *Ideal Electronic Sec. Co. v. International Fidelity Ins. Co.*, 129 F.3d 143, 150 (D.C. Cir. 1997); *Cohn v. Taco Bell Corp.*, 1995 WL 493453, *6 (N.D. Ill. 1995); *Warranty Corp., Inc. v. Hans*, 2000 WL 284261, *6 (S.D. Ala. 2000).

■ In the absence of a contractual requirement to the contrary, we adopt the Second Circuit approach for the many practical reasons described in *McGuire*. The judge is better equipped than the jury to determine the appropriate rate of compensation and determine whether the time claimed is reasonable. See *McGuire*, 1 F.3d at 1316. Determining the amount of fees necessarily involves the fact-finder in the details of how the case was prepared and tried, including the tactical choices of the lawyer. Allowing the jury to "look behind the curtain of a case" may improperly affect their deliberation on the merits unless the trial is bifurcated. *Id.* at 1316-17 (Jacobs, J., concurring). Deciding the amount of fees post-trial is more efficient because the evidence need be presented only if the party seeking the award prevailed on the merits. See *id.* at 1316; *Meadowbrook, LLC*, 959 P.2d at 117. Finally, post-trial adjudication is the only way to account fully for the legal services provided:

> [A]lthough the judge can compute the amount of attorneys' fees after a trial with perfect hindsight, the jury would have to keep a running total of fees as they accrued through summations and then predict future fees from post-trial proceedings and motions. The prospect of such a trial evokes images of an attorney struggling to prove the amount of fees to which he is entitled, but never being able to do so because he must prove the value of his last words even as he speaks them, and also the value of words yet unuttered and unwritten.

*McGuire*, 1 F.3d at 1316. Indeed, under defendants' theory, the superior court would have to hold a subsequent jury trial to determine the amount of attorneys' fees to award a prevailing party on appeal.

■ We also agree with the *McGuire* court that defendants have no constitutional right to have the amount of attorneys' fees determined by a jury. See *id.* Although the Seventh Amendment to the United States Constitution and Vermont's constitutional jury trial

provisions, Vt. Const. Ch. I, Art. 12, Ch. II, § 38, are not entirely coextensive, see *Hoague*, 140 Vt. at 593, 442 A.2d at 1284, neither provides a right to a jury trial in equitable matters. See *Curtis v. Loether*, 415 U.S. 189, 193 (1974); *In re Weatherhead*, 53 Vt. 653, 657 (1881). As *McGuire* holds, the determination of the amount of attorneys' fees involves equitable accounting. 1 F.3d at 1314-15.

We agree with defendants that in disputes between attorney and client over attorneys' fees, see *Simler v. Conner*, 372 U.S. 221, 223 (1963), or in cases where attorneys' fees incurred in one litigation are sought as damages in another suit, see, e.g., *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 460-61, 752 A.2d 26, 34 (2000), the issues must be resolved by a jury. When we are considering how attorneys' fees incurred in a case will be borne in that same case, we are drawing a line between damages and court costs, which are traditionally determined by the court. The import of the 1996 addition to V.R.C.P. 54(d) is to treat attorneys' fees generally as costs. We do not believe that there is a neat constitutional line between instances where attorneys' fees for the case before the court are treated as costs to be determined by the judge, and instances where they are treated as damages determined by the jury.

Although *McGuire* requires the entitlement to attorneys' fees be determined by the jury, in this case plaintiffs are entitled to attorneys' fees as a matter of law. The fact that the jury did not make an entitlement decision in this case is no bar to their award. See *Warranty Corp.*, 2000 WL 284261, at *6; *News Shows v. Don King Prod. Inc.*, 1999 WL 553780, *11 (S.D.N.Y. 1999) (if no further finding of fact required with regard to plaintiff's entitlement to attorneys' fees on breach of contract claim, the amount of attorneys' fees to be awarded may appropriately be determined by court without finding of entitlement by jury).

■ Because we hold that plaintiffs did not have to present evidence in support of their attorneys' fees request to the jury, we also reject defendants' argument that plaintiffs had to include a demand for attorneys' fees in their pleadings.[5] See *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 875 F. Supp. 165, 178-79 (S.D.N.Y. 1994) (failure to demand attorneys' fees in pleadings does not bar recovery where contract provides for award of attorneys' fees, because no prejudice can be shown).

------

[5] Nor do we reach plaintiffs' rejoinder that the attorneys' fees request under the consumer fraud act was sufficient.

Finally, in support of the court's decision to deny fees, defendants raise two additional reasons why they assert attorneys' fees are unavailable to plaintiffs. First, they argue that the purchase and sales contract does not authorize attorneys' fees in a dispute over a breach of the dirt work provision.

The dirt work provision is contained in the "special conditions to purchase and sale agreement" between the parties. It was signed by the parties on the same day as the purchase and sales contract and was attached to that contract. The parties' intent was to link it to the purchase and sales contract.

The default provision of the purchase and sales contract provides a right of attorneys' fees for the prevailing party "[i]n the event legal action is instituted arising out of a breach of this contract." The special conditions contain no separate default provision. Because the special conditions are explicitly made part of the purchase and sales contract, a breach of one of those conditions is necessarily a breach of the contract. Because attorneys' fees can be collected for breach "of this contract," they can be collected for breach of the special conditions including the dirt work obligation.

Second, defendants argue that plaintiffs are not entitled to attorneys' fees as a matter of law because the jury did not specify whether it found a breach of the purchase and sales contract, which contains an attorneys' fees provision, or a breach of the escrow agreement, which does not. As we discussed above, the escrow agreement is simply a security device to aid plaintiffs in having the dirt work done, and it fulfilled its purpose when the escrow fund was released. Thus, the jury had to find a breach of the purchase and sales contract. In any event, the obligations under these two agreements were essentially identical; we can conceive of no circumstance under which a breach of the escrow agreement is not a breach of the purchase and sales contract.

It is undisputed that plaintiffs complied with V.R.C.P. 54(d)(2), by filing a timely motion for attorneys' fees with the trial court. The court erred in denying the motion without considering it on the merits. Because of our conclusion, we do not reach plaintiffs' argument that they were entitled to an award of fees pursuant to 9 V.S.A. § 4007(c).

## B.

Plaintiffs also appeal the decision of the trial court authorizing defendants to post a surety bond in lieu of plaintiffs' real property

attachments and releasing those attachments when the bond was posted. After the jury verdict and before entry of judgment, plaintiffs moved for and were granted writs of attachment against the real property of the defendants totaling $200,000. Shortly thereafter, defendants filed a motion to substitute collateral, representing that the attachments were preventing sales of defendants' development real estate to purchasers. Attempts to negotiate over substitute collateral failed, and in November 1998, defendants filed an emergency motion to post a surety bond and dismiss the attachments. By this time, judgment had been entered, and defendants had filed a notice of appeal from that judgment. The court granted the motion, and defendants posted the necessary bond resulting in release of the attachments and plaintiffs' appeal of the issue.

We are confronted first with defendants' argument that the collateral substitution decision is not appealable under V.R.A.P. 3 because it is not a final judgment. Defendants' position is that the order is neither a judgment, appealable under V.R.A.P. 3(a), nor an order or ruling prior to entry of judgment, appealable with permission under V.R.A.P. 5. They suggest that the collateral substitution order might be considered a collateral order, appealable with permission under V.R.A.P. 5.1, but plaintiffs never sought permission to appeal.

V.R.C.P. 62(f) recognizes the power of this Court "to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered." This case was already on appeal in this Court when the collateral substitution order was issued. We do not believe that we need a separate source of appellate jurisdiction to review the order.

In arguing that the court had no power to allow the collateral substitution, plaintiffs rely primarily on the wording of V.R.C.P. 4.1(e)(2) and our decision in *Turgeon v. Schneider*, 148 Vt. 630, 531 A.2d 1200 (1987) (mem.). Rule 4.1(e)(2) authorizes the court to discharge an attachment "upon the defendant's giving bond to the plaintiff in such sum and with such sureties as the judge directs, conditioned for the payment by the defendant of damages and costs which the plaintiff may recover in the action." This language, however, is part of a subdivision that commences with the phrase: "At any time before the entry of final judgment, defendant may move [the court] for an order modifying or discharging any attachment." Plaintiffs argue that the limiting language makes the authorization inapplicable here where the motion was made after the entry of judgment. In support of this construction, they point out that the rule

on continuing attachments after entry of judgment contains no power to modify the attachment. See V.R.C.P. 62(e).

Plaintiffs' argument finds some support in *Turgeon*, in which the trial court dissolved an attachment after entry of judgment. We held that Rule 62(e)[6] did not authorize dissolution of the attachment, and Rule 4.1(e)(2), which might contain such an authorization, was inapplicable. See *Turgeon*, 148 Vt. at 631, 531 A.2d at 1201.

This case represents a significant step beyond *Turgeon*, and we can conceive of no reason why the rules would contemplate such a step. *Turgeon* construes the rules to implement a policy judgment that a motion to dissolve an attachment must be made prior to judgment or it is waived. In such circumstances, the plaintiff may lose the ability to collect the judgment so that dissolution of the attachment is the equivalent of canceling the judgment.

Here, the court authorized only a substitution of collateral, finding that plaintiffs' ability to collect the judgment would not be impaired by the substitution. There is no discernible reason to limit the court's power to authorize such a substitution to the time before final judgment. Plaintiffs' legitimate interests are fully protected, whether before or after judgment, by the court's supervision to ensure that the bond is as effective as the attachment to pay the judgment. The court appropriately exercised that supervision here.

We construe rules with the same construction aids as we employ with statutes. See *State v. Fisher*, 167 Vt. 36, 41, 702 A.2d 41, 44 (1997); *State v. Rusin*, 153 Vt. 36, 37-38, 568 A.2d 403, 404-05 (1989). We must read provisions of the rules "as a whole, looking to the reason and spirit of the law and its consequences and effects to reach a fair and rational result." *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999). We try to "avoid absurd results manifestly unintended." *Roddy v. Roddy*, 168 Vt. 343, 347, 721 A.2d 124, 128 (1998). We conclude that the court had the power to authorize substitution of collateral by reading V.R.C.P. 4.1(e)(2) and 62(e) together. Rule 4.1(e)(2) authorizes the substitution of collateral prior to entry of judgment. Rule 62(e) provides that the attachment "shall . . . continue" through the appeal period and during any appeal. We hold that the attachment continues under the terms and conditions imposed prior to judgment, including the power of the court to order substitution of collateral.

---

[6] At the time *Turgeon* was decided, Rule 62(e) was designated 62(f). See Reporter's Notes — 1996 Amendment.

*The judgment of the court for plaintiffs is reversed and remanded to eliminate the award of punitive damages. The judgment of the court on defendants' counterclaim is reversed and remanded for a new trial unless plaintiffs accept an additur in the amount to be determined by the court. In all other respects, the judgments are affirmed.*

*The order of the court denying attorneys' fees to plaintiffs is reversed and remanded for determination of a fee award.*

*The order of the court dissolving the writs of attachment, conditional on defendants filing a qualifying surety bond, is affirmed.*