2013 VT 91



Carpentier
v. Tuthill and Hartford Town Clerk (2012-177 &
2012-235)

 

2013 VT 91

 

[Filed 04-Oct-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 91
 
  


 Nos. 2012-177 & 2012-235
 
  


 Doreen Carpentier
 
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Windsor Unit,
 
 
  
 
 
 Civil Division
 
 
  
 
 
  
 
 
 Douglas Tuthill
 and Town of Hartford Town Clerk
 
 
 January Term, 2013
 
 
  
 
 
  
 
 
 Doreen Carpentier
  
       v.
  
 Douglas Tuthill
  
 
 
  
 
 
 Theresa
 S. DiMauro, J.
 
 
  
 
 Paul J. Perkins of Plante
& Hanley, P.C., White River Junction, for Plaintiff-Appellee.

 

W. E. Whittington of Whittington Law Associates, PLLC,
Hanover, New Hampshire, for 

  Defendant-Appellant.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Skoglund, Burgess and Robinson, JJ.

 

 

¶ 1.            
BURGESS, J.   Defendant Douglas Tuthill,
Administrator of the Estate of Paul Oakes, appeals from the jury’s award of
$150,000 in punitive damages to plaintiff Doreen Carpentier
and the trial court’s denial of his motion for remittitur.
 Defendant also challenges the trial court’s denial of his post-judgment motion
to vacate a writ of attachment.  We affirm.

¶ 2.            
In January 2010, Paul Oakes was charged with numerous crimes based on
acts alleged to have occurred at plaintiff’s home.  Oakes killed himself
shortly before his arraignment on these charges.  Following Oakes’s death,
plaintiff sued his estate, raising claims of assault and battery, false
imprisonment, and intentional infliction of emotional distress.  She
sought compensatory and punitive damages.  Plaintiff also requested a writ
of attachment against certain real property owned by Oakes.  The parties
later stipulated that the court could issue a writ of attachment “without
prejudice to the defendant’s right to contest the attachment at a later date.”
 

¶ 3.            
The court bifurcated the liability and punitive
damages components of the trial.  Taking the evidence in the light most
favorable to plaintiff, the following evidence was presented at the liability
portion of the trial.  Plaintiff lived with her grandchildren in an apartment
complex for families in transition from homelessness to self-sufficiency. 
Plaintiff contacted Oakes Salvage to see if it would purchase her totaled
car.  She spoke to the owner, Paul Oakes, who showed up at plaintiff’s
apartment unannounced a few days later.  Oakes bought the totaled vehicle,
and plaintiff told him that she would obtain a proper title from the Department
of Motor Vehicles.  When Oakes returned later that day to pick up the car,
he commented to plaintiff about the many single women living in the apartment
complex.  He stated that he understood the women’s “situation” and then
offered plaintiff money to have sex with him.  During the next several
days, Oakes called plaintiff twenty times. 

¶ 4.            
Oakes returned to plaintiff’s apartment, asking about the vehicle
title.  He then told plaintiff that he would pay her $200 to have sex with
him.  Plaintiff told Oakes that she “wasn’t like that.”  Oakes
continued telling her that he knew she needed money and that he would pay her
to have sex with him.  Plaintiff told Oakes to leave, and he eventually
did.  Plaintiff reported Oakes’s behavior to police.  

¶ 5.            
The next morning, plaintiff discovered Oakes inside her apartment. 
He had not been invited, he did not notify plaintiff ahead of time and did not
knock.  Oakes lunged at plaintiff.  He grabbed her shirt and tried to
pull it off.  He said, “show me your tits.” 
He put his hand under plaintiff’s shirt and touched her breasts. 
Plaintiff tried to get away from him, and Oakes grabbed her from behind. 
He restrained her, took both her arms with one hand, and got behind her. 
With his other hand, he pushed her head down and began grinding himself into
her, simulating anal sex.  He asked plaintiff if she would do it that
way.  Plaintiff believed that Oakes was about to rape her.  Plaintiff
finally broke free of Oakes’s restraint.  Oakes told her that when he came
back, plaintiff would have sex with him for money.  

¶ 6.            
The jury returned a verdict in plaintiff’s favor on all three counts in
her complaint and awarded her $30,000 in compensatory damages.  During the
second phase of the trial, plaintiff introduced evidence of Oakes’s prior
convictions for rape, attempted rape, and two violations of probation. 
The evidence also included an affidavit from an undercover police officer
recounting the details underlying the 1977 attempted rape charge. 
Additionally, plaintiff introduced an affidavit from Oakes’s attorney in one of
the criminal cases.  The attorney recounted that Oakes had a 1974
conviction for rape, for which he was placed on probation; and a 1977 attempted
rape conviction, for which he was again placed on probation.  He averred
that Oakes was discharged from probation in both cases in July 1983. 
Finally, plaintiff introduced an inventory of Oakes’s estate.  Defendant
presented evidence from the Special Administrator of the Estate, who testified
about expenses that the estate had incurred as well as his belief about the
salability of the estate’s real property.  The jury awarded plaintiff
$150,000 in punitive damages.  Defendant appealed.  

¶ 7.            
During the pendency of the proceedings described above, defendant sought
a license from the probate court to sell the real property that plaintiff had
attached.  At a hearing on the motion, the probate court apparently asked
plaintiff, at the estate’s request, to explain why her claim was entitled to
priority over administrative expenses.  Plaintiff responded that this
issue was not properly before the probate court, but that her claim deserved
priority because it was secured by an attachment.  In a February 2012
order, the probate court concluded that plaintiff’s claim was not entitled to
priority over administrative expenses.  It reasoned that, under 14 V.S.A.
§ 1417, attachments secured subsequent to a defendant’s death could not be
executed upon.  In a separate order, the court denied defendant’s request
for a license to sell real estate because the potential buyers were Oakes’s
personal friends and the sale price might be below fair market value.  No
appeals were taken from these orders.  

¶ 8.            
In June 2012, defendant filed another motion to sell real estate in the
probate court.  Defendant also filed a “motion to clarify that attachment
is void” in the superior court, based on the probate court’s earlier
ruling.  Defendant maintained that the superior court could address this
motion even though the case was on appeal.  Plaintiff opposed the
motion.  The superior court denied defendant’s request, finding that none
of its prior orders had voided the writ of attachment nor would the court void,
strike, or otherwise vacate the April 2010 writ of attachment while the case
was on appeal.  Defendant appealed from this order, and the appeals were
consolidated in this Court.  

¶ 9.            
Meanwhile, in July 2012, the probate court granted defendant a license
to sell real estate.  The superior court subsequently allowed defendant to
deposit $259,806 of the sale proceeds with the court as substitute collateral
for the attachment.  The court denied defendant’s request that the money
be deposited with the probate court.

¶ 10.         With
this procedural history in mind, we turn to the merits.  We begin with
defendant’s assertion that the court erred in admitting evidence of Oakes’s
prior convictions during the punitive damages phase of the trial.
 Defendant maintains that these convictions, which date from 1974 and
1977, were not relevant under Vermont Rule of Evidence 401 and were propensity
evidence barred by Rule 404(b).  

¶ 11.         It
does not appear that defendant raised a Rule 401 argument below.  Even
assuming that both of defendant’s evidentiary arguments were preserved,
however, we find no error.  See Sweet v. Roy, 173 Vt. 418, 434, 801
A.2d 694, 706 (2002) (emphasizing that trial courts have wide discretion in
ruling on the admissibility of evidence and that its rulings will not be
reversed absent abuse of discretion).  As discussed below, the evidence
was relevant to the jury’s assessment of the reprehensibility of Oakes’s
conduct, and its admission did not violate Rule 404(b).  

¶ 12.         To be
entitled to punitive damages, plaintiff needed to prove two essential elements:
(1) wrongful conduct that is outrageously reprehensible; and (2) malice.  Fly
Fish Vt., Inc. v. Chapin Hill Estates, Inc., 2010 VT 33, ¶ 18, 187 Vt. 541,
996 A.2d 1167.  In assessing the reprehensibility
of a defendant’s actions, a jury may consider whether “the conduct involved
repeated actions or was an isolated incident.”  Shahi
v. Madden, 2008 VT 25, ¶ 26, 183 Vt. 320, 949 A.2d 1022 (observing
that degree of reprehensibility of defendant’s conduct is the “most important
indicium of the reasonableness of a punitive damages award” (citation
omitted)).  As the U.S. Supreme Court explained: 

Certainly, evidence that a defendant has repeatedly engaged in
prohibited conduct while knowing or suspecting that it was unlawful would
provide relevant support for an argument that strong medicine is required to
cure the defendant’s disrespect for the law.  Our holdings that a
recidivist may be punished more severely than a first offender recognize that
repeated misconduct is more reprehensible than an individual instance of
malfeasance.  

 

BMW of N.
Am., Inc. v. Gore, 517 U.S. 559, 576-77 (1996) (citation omitted). 
This language is consistent with prior holdings of the U.S. Supreme Court and
of this Court.  See, e.g., TXO Prod.
Corp. v. Alliance Res. Corp., 509 U.S. 443, 462 n.28 (1993) (indicating
that “the existence and frequency of similar past conduct” is a relevant
consideration in assessing punitive damages (quotation omitted)); Sweet,
173 Vt. at 440-41, 801 A.2d at 710-11 (citing Gore, 517 U.S. at 576-77,
and finding prior bad act evidence relevant and admissible on whether to award
punitive damages and on amount of any punitive damages, and citing other cases
so holding).  

¶ 13.         Defendant
argues that Gore and Sweet are distinguishable.  According
to defendant, in both cases, the courts were looking at ongoing conduct that continued
to the time of the wrong to the plaintiffs.  Defendant also asserts that
both cases involve vicarious liability where a legal person was being held
liable for what someone else did and therefore the prior acts, which were close
in time, were relevant to show actual knowledge by the defendants.  He
maintains that the U.S. Supreme Court’s comment about recidivism was simply a
comment on criminal sentencing, unrelated to that Court’s holding or to this
case.  

¶ 14.         We do
not read these cases so narrowly.  Neither court indicated that bad acts
must continue to the present in order to be relevant in assessing
reprehensibility.  Neither indicated that prior bad acts are relevant only
in vicarious liability cases.  The courts’ recognition that a defendant’s
past behavior may be relevant to assessing punitive damages did not turn on the
factual distinctions identified by defendant.  Indeed, we cited cases in Sweet,
173 Vt. at 440-41, 801 A.2d at 711, in support of our holding that did not
involve the factual distinctions on which defendant relies.  See Webster
v. Boyett, 496 S.E.2d 459, 462-63 (Ga. 1998)
(holding that, in automobile negligence action where defendant was alleged to
be intoxicated, evidence of prior acts of driving while intoxicated was
admissible as bearing on punitive damages); see also Harris v. Soley, 2000 ME 150, ¶ 23, 756 A.2d 499 (holding that,
in tort action against former landlord for intentional infliction of mental
distress, conversion and breach of contract based on landlord failing to
maintain premises and sending agents to break into the apartment, “prior
misconduct by a defendant that is similar to the misconduct giving rise to
liability” is admissible for “the determination of punitive damages”).  

¶ 15.         Moreover,
we find the U.S. Supreme Court’s observation about criminal sentencing directly
pertinent.  See Gore, 517 U.S. at 577 (citing Gryger
v. Burke, 334 U.S. 728, 732 (1948)).  As the Gryger
Court explained, when a criminal is sentenced as a habitual offender, he or she
is not receiving an additional penalty for earlier crimes.  334 U.S. at 732.  Instead, that person receives “a
stiffened penalty for the latest crime, which is considered to be an aggravated
offense because a repetitive one.”  Id.  So too in the civil
context, an individual’s acts may be considered more reprehensible, and thus
subject to a heightened penalty, because they are repetitive.  

¶ 16.         Defendant
next asserts that because convictions older than fifteen years cannot be used
to impeach a witness’s credibility under Rule 609, it follows that they should
not be admissible in assessing punitive damages.  Defendant cites no
authority for this proposition, and the supposed analogy between
reprehensibility and credibility is not apparent.  The fact that Oakes’s
prior convictions were remote in time might make them less compelling evidence,
but it does not make them irrelevant.  See V.R.E. 401 (defining “relevant
evidence” as “evidence having any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less
probable than it would be without the evidence”).  The jury could
reasonably conclude that Oakes’s behavior was more reprehensible given his
prior misconduct and that he needed “strong medicine” to cure his disrespect
for the law.  Gore, 517 U.S. at 576-77.  

¶ 17.         We
are equally unpersuaded by defendant’s assertion that
this evidence is barred by Rule 404(b).  Rule 404(b) “bars propensity
evidence—that is, evidence that is presented in order to convince the jury that
it is more likely that defendant did the act presently charged because it is
similar to something he has done in the past.”  State v. Robinson,
158 Vt. 286, 289, 611 A.2d 852, 854 (1992), abrogation on other grounds
recognized by State v. Carter, 164 Vt. 545, 550, 674 A.2d 1258, 1262
(1996).  Prior bad acts may be admitted for other purposes, including the
examples set forth in the rule, such as common plan and scheme, but the list is
not exclusive.  Id.  In this case, Oakes’s convictions were
not being used to show that, because Oakes had committed similar crimes in the
past, it was more likely that he committed the acts alleged in plaintiff’s
complaint.  The jury had already determined that Oakes committed the acts
at issue.  Instead, the convictions were used to show the degree of
reprehensibility, a permissible “other purpose” under the rule.  See Sweet,
173 Vt. at 440-41, 801 A.2d at 710-11 (reaching similar conclusion).  

¶ 18.         Defendant
maintains that the prior bad acts must be close in time to the acts at issue to
be admissible under Rule 404(b).  The cases cited for this proposition,
however, involve evidence used to show the existence of a “plan.”  See,
e.g., State v. Catsam, 148 Vt. 366, 381-82,
534 A.2d 184, 194 (1987) (requiring, when admitting prior bad act evidence to
prove the existence of a plan, that there be “similarity between the prior acts
and the crime charged and proximity in time”); State v. Winter, 162 Vt.
388, 397-98, 648 A.2d 624, 630 (1994) (finding prior bad act too remote in time
to be admissible under Rule 404(b) to show a plan of sexual molestation). 
The language in Sweet, on which defendant similarly
relies, again relates to admission of prior bad acts to show a plan. 
See 173 Vt. at 436, 801 A.2d at 708.  The
evidence at issue here was not admitted to prove a plan, and the cases cited by
defendant are inapposite.  

¶ 19.         Defendant
next argues that the punitive damages award was excessive and that the court
therefore erred in denying its motion for remittitur.  In the motion filed
below, defendant asked the trial court to require plaintiff to remit the
punitive damages award from $150,000 to $50,000, and, failing such remittitur,
to order a new trial on the ground that the punitive damage award was
excessive.*
 The trial court denied this request, rejecting defendant’s arguments and
finding that the award withstood constitutional scrutiny.  See Shahi, 2008 VT 25, ¶ 25 (explaining that “[p]unitive-damage awards are subject to constitutional
scrutiny because due process demands ‘that a person receive fair notice not
only of the conduct that will subject him to punishment, but also of the
severity of the penalty that a State may impose’ ” (quoting Gore, 517
U.S. at 574)).  We review the court’s remittitur ruling for abuse of
discretion, id. ¶ 23, and find no abuse here.  

¶ 20.         Defendant
argues that the punitive damages award exceeds the value of the estate, and
that there are mitigating factors that diminish the reprehensibility of Oakes’s
conduct, such as the fact that plaintiff suffered no physical injuries as well
as the fact that Oakes had a low IQ.  Defendant also points to the fact
that the punitive damage award was five times greater than the compensatory
damages award, arguing that this shows that the award was intended to be
“appropriative of the entire value of the Estate.”  Finally, defendant
suggests that the jury was punishing the estate for Oakes’s prior criminal
acts.  

¶ 21.         With
respect to the value of the estate, defendant relies on evidence not presented
to the jury.  As the trial court found, it would be inappropriate to grant
remittitur based on evidence outside the record.  See Mathieu Enters.,
Inc. v. Patsy’s Cos., 2009 VT 69, ¶¶ 12-14, 186 Vt. 557, 978 A.2d 481
(finding error in court’s decision to grant remittitur based on evidence not
introduced at trial).  The estate inventory, introduced at trial, set the
estate’s value at approximately $473,000.  Defendant presented testimony
that the estate was worth less than this amount.  It was for the jury to
evaluate this evidence and make its award accordingly.  See, e.g., Powers
v. Judd, 150 Vt. 290, 293, 553 A.2d 139, 141 (1988) (explaining that weight
of evidence, credibility of witnesses, and persuasive effect of testimony are
for the trier of fact, and where there is a conflict in the evidence, trier of
fact is free to choose evidence it finds persuasive).  The jury’s award
was well within the bounds of the evidence presented at trial.  See Mathieu
Enters., Inc., 2009 VT 69, ¶ 10 (“Remittitur is appropriate only if the
jury’s verdict is outside the universe of possible awards which are supported
by the evidence.” (quotation omitted)).  In a
similar vein, it was for the jury, as factfinder, to
decide the degree of reprehensibility of Oakes’s conduct, including the effect
of any mitigating factors.  

¶ 22.         We
similarly reject defendant’s assertion that remittitur was warranted because
the punitive damage award was five times greater than the compensatory damage
award.  As the U.S. Supreme Court has recognized, there is no
“mathematical bright line” between a constitutionally acceptable punitive
damage award and an unconstitutional award.  Gore, 517 U.S. at
582-83.  Rather, “the most important indicium of the reasonableness of a
punitive damages award is the degree of reprehensibility of the defendant’s
conduct.”  Id. at 575.  In evaluating
reprehensibility, courts consider whether: 

the harm caused was physical as opposed to economic; the
tortious conduct evinced an indifference to or a reckless disregard of the
health or safety of others; the target of the conduct had financial
vulnerability; the conduct involved repeated actions or was an isolated incident;
and the harm was the result of intentional malice, trickery, or deceit, or mere
accident.  

 

State Farm Mut. Auto Ins. Co. v.
Campbell, 538 U.S. 408,
419 (2003).  

¶ 23.         All
of these factors support the jury’s award here.  The evidence showed that
Oakes physically attacked plaintiff in her home.  He lunged at her, put
his hands under her shirt, touched her breasts, restrained her, simulated sex
acts with her, and repeatedly offered her money for sex.  Plaintiff was a
financially vulnerable individual.  Oakes engaged in repeated misconduct
toward plaintiff, and he had committed similar acts in the past against
others.  Oakes acted intentionally and with evident malice.  

¶ 24.         To
the extent that ratios between the awards are relevant, we agree with the trial
court that the award here was well within the range of ratios recognized by the
Supreme Court as presumptively within the bounds of due process.  See id.
at 425 (observing that “single-digit multipliers are more likely to comport
with due process, while still achieving the State’s goals of deterrence and
retribution,” than awards with ratios of 145:1 or 500:1); see also Shahi, 2008 VT 25, ¶ 27 (finding 2:1 ratio between
punitive damage and compensatory damage award “on the low end of the range of
single-digit ratios recognized by the United States Supreme Court as
presumptively within the bounds of due process”); Sweet, 173 Vt. at 446,
801 A.2d at 714-15 (concluding that ratio of 10:1 was reasonable, and noting
that courts have routinely upheld much greater ratios).  

¶ 25.         Finally,
like the trial court, we find no support for defendant’s assertion that the
jury was punishing Oakes for prior misconduct.  The court instructed the
jury that it could consider Oakes’s prior convictions only in determining the
reprehensibility of his conduct in the instant case, and that its punitive
damages award must not seek to punish him for the impact of his alleged
misconduct on other persons who might bring lawsuits of their own.  We
presume that the jury followed the court’s instructions.  See, e.g., Boehm v. Willis,
2006 VT 101, ¶ 19, 180 Vt. 615, 910 A.2d 908.
 We find no error in the court’s denial of defendant’s motion for remittitur. 


¶ 26.         We
turn next to defendant’s challenge to the writ of attachment.  Defendant
argues that the superior court lacked authority under 14 V.S.A. § 1417 to
attach the estate’s property.  He maintains that the probate court so
ruled and that plaintiff is barred by the doctrine of
res judicata from challenging the probate court’s ruling.  In a similar
vein, defendant asserts that the estate distribution statute, 14 V.S.A. § 1205,
requires that the attachment be vacated.  Defendant again points to the probate court’s ruling that plaintiff’s claim against
the estate was entitled to no priority under this statute and asserts
that plaintiff is bound by this ruling.  

¶ 27.         We do
not reach the substance of these arguments because defendant waived its right
to challenge the attachment.  As previously recounted, plaintiff obtained
a writ of attachment in April 2010.  The parties agreed that the court
could issue the writ to satisfy any judgment obtained by plaintiff, and they
agreed that the writ would be “without prejudice to the defendant’s right to
contest the attachment at a later date.”  Plaintiff obtained a judgment in
her favor on December 1, 2011, and filed a certified copy of the judgment order
in the town land records.  Defendant did not contest the writ prior to
entry of the judgment order.  

¶ 28.         The
rules plainly require a party to challenge a writ of attachment before entry of
final judgment.  See V.R.C.P. 4.1(e)(2) (“At any
time before entry of final judgment, defendant may move the Presiding Judge of
the court in which the action is pending for an order modifying or discharging
any attachment.”).  Writs of attachment continue while a case is on appeal
“unless dissolved by operation of law.”  V.R.C.P. 62(e). 
The phrase “operation of law” does not include “an order of court, made upon
motion of a party.”  Turgeon v. Schneider, 148
Vt. 630, 630, 531 A.2d 1200, 1200 (1987) (mem.). 
We have expressly held that a trial court does “not have the authority, under
V.R.C.P. 4.1, to order discharge of the attachment after final judgment,” nor
does this Court have such power.  Id. at 631, 531
A.2d at 1201.

¶ 29.         We
reiterated this holding in Murphy v. Stowe Club Highlands, 171 Vt. 144,
166, 761 A.2d 688, 703 (2000).  As we stated there, 

Turgeon
construes the rules to implement a policy judgment that a motion to dissolve an
attachment must be made prior to judgment or it is waived.  In such
circumstances, the plaintiff may lose the ability to collect the judgment so
that dissolution of the attachment is the equivalent of canceling the
judgment.  

 

Id.  This language is
directly applicable here.  By failing to move to dissolve the attachment
prior to final judgment, defendant waived its right to do so.  Any right
that defendant retained to “contest the writ at a later date” needed to be
exercised within the bounds of the rules of procedure.  

¶ 30.         None
of defendant’s arguments persuade us otherwise.  The probate court ruling
on which defendant
relies post-dates the superior court’s judgment order.  Defendant does not
explain how this later ruling could have a res judicata effect on a prior order
issued by the superior court.  See Berlin Convalescent Ctr., Inc. v. Stoneman, 159 Vt. 53, 56, 615 A.2d 141, 143 (1992)
(explaining that doctrine of res judicata “bars the litigation of a claim or
defense if there exists a final judgment in former litigation in which the
‘parties, subject matter and causes of action are identical or substantially
identical’ ” (citation omitted)).  

¶ 31.         Defendant
suggests in its reply brief that there was no waiver of the right to challenge
the writ of attachment because the court’s “jurisdiction” may be challenged at
any time.  Unexplained, however, is how a challenge to the superior court’s
authority to issue a writ of attachment implicates the court’s subject matter
jurisdiction over this case.  See, e.g., In re C.P., 2012 VT 100, ¶
18, __ Vt. __, 71 A.3d 1142 (explaining that where court has jurisdiction over
a general category of case, an error in exercising its jurisdiction in a
particular case within that category ordinarily is insufficient to render a
resulting judgment void for lack of subject matter jurisdiction); Lamell Lumber Corp. v. Newstress
Int’l, Inc., 2007 VT 83, ¶ 6, 182 Vt. 282, 938 A.2d 1215 (“ ‘Subject
matter jurisdiction’ refers to the power of a court to hear and determine a
general class or category of cases.”).  Defendant fails to develop or
proffer how plaintiff’s cause is beyond the general jurisdiction of the superior
court to address the validity of attachment writs, and we decline to explore it
on this record.  See Brigham v. State, 166 Vt. 246, 269, 692 A.2d
384, 398 (1997) (stating that Court will not undertake search for error where
claims are inadequately briefed and argued).  We find no error in the
court’s denial of defendant’s post-judgment “motion to clarify that attachment
is void.”  

Affirmed.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











* 
Defendant suggests in its brief that no punitive damages were appropriate
because (1) Oakes is dead, and thus, the award could have no deterrent effect,
and (2) plaintiff has been fully compensated by the compensatory damage
award.  Defendant did not argue below that, as a matter of law, the jury
could not award punitive damages, and we consider these arguments waived. 
See Ferrisburgh Realty Investors v.
Schumacher, 2010 VT 6, ¶ 27, 187 Vt. 309, 992 A.2d 1042 (holding that party
waived argument that no punitive damages should have been awarded by failing to
raise issue at trial or in motion for directed verdict at close of case). 
Thus, we do not reach the question of whether punitive damages can ever be
rightfully awarded against an estate.