2014 VT 127

**David Ring v. Carriage House Condominium Owners' Association, Thomas Maroldt, Edward Morrison and Donna Beck**

[112 A.3d 754]

No. 13-419

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed November 21, 2014

---

[1] Justice Crawford was present for conference on the briefs, but did not participate in this decision.

*Steven H. Atherton,* Northfield Falls, for Plaintiff-Appellant/ Cross-Appellee.

*Brice Simon* of *Breton & Simon, PLC*, Stowe, for Defendant-Appellee/Cross-Appellant Beck.

¶ 1. **Skoglund, J.** This appeal is the culmination of a longstanding feud stemming from plaintiff David Ring's renovation of his recently purchased condominium units and resulting in multiple legal proceedings as well as several superior court decisions. Ring argues that the superior court erred in awarding him only a fraction of his requested attorney's fees after determining, following a lengthy bench trial, that defendants — the condominium owners' association and some of its individual members — had breached the covenant of good faith and fair dealing implied in the parties' earlier settlement agreement. He also argues that the court erred in denying his request for pre-litigation attorney's fees and prejudgment interest. Defendant Donna Beck cross-appeals, arguing that the court erred in assessing punitive damages against defendants and holding her liable for punitive damages attributable to her deceased husband, defendant Edward Morrison, based on her real estate partnership with him. We affirm.

## I. Facts and Procedural History

¶ 2. The membership of Carriage House Condominium Owners' Association includes several owners of condominium units in two buildings comprising a commercial condominium located on Main Street in the Town of Stowe. In 1996, Ring, a licensed engineer and surveyor, purchased two unfinished units located in the hayloft space of a former barn, one of the two buildings. Among the other unit owners was defendant Thomas Maroldt, who owned a unit in the barn, and Beck and Morrison, who owned four units, including one in the barn. At the same time Ring purchased his units, he obtained rights from the condominium declarant that allowed him to develop the units without obtaining approval from the Association. Association members believed that the declarant's development rights either already had been, or could only be, transferred to the Association. Ring's asserted ownership of the development rights led to legal actions to clarify ownership of those rights. When Ring obtained a building permit, the Association sued him and appealed the Town of Stowe's issuance of the permit.

¶ 3. These disputes were resolved by a 2001 settlement agreement that is at the heart of the instant case. Essentially, Ring

agreed to give up his claim to the declarant's development rights, and the Association agreed to allow Ring to build the permitted addition, as long as the roof and floor were "structurally sound" and there was no negative stress impact on the other units. A year after the settlement agreement was signed, Maroldt sued Ring and joined the Association as a necessary party. Maroldt alleged, among other things, that Ring was engaged in construction without the Association's approval. Ring counterclaimed, arguing that the Association had wrongfully withheld its approval. The lawsuit went to trial in March 2003, and Ring prevailed. The jury awarded Ring $3600 for his increased costs resulting from the Association's violation of the settlement agreement.

¶ 4. Six days after the jury verdict, notwithstanding the jury's conclusion that Ring had not violated the settlement agreement, the Association sent a letter to the town zoning administrator stating that Ring's construction was not in compliance with the settlement agreement. The Association also hired an engineering firm to look into its concerns about the structural integrity of Ring's addition. Based on its understanding that Ring did not intend any additional structural support for his project, the engineering firm found that the structure did not meet code requirements. By May 2003, Ring realized that the structural impacts of his addition would have to be addressed, and that cooperating with the Association's engineering firm would be the easiest and least expensive way to do so.

¶ 5. By the end of September 2003, Ring was agreeable to a plan devised by the Association's engineering firm, but some members of the Association, including Maroldt, Morrison, and Beck, were not. As the result of letters from Maroldt and Morrison, the Department of Labor and Industry had another engineering firm assess the building's structural systems. Pressured by the Department, the Association had its engineering firm come up with another plan to make Ring's project structurally sound. In December 2003, Ring accepted the new plan and submitted it to the Department, which indicated that it was satisfied. Ring went ahead with construction and completed the work in 2004. After a final inspection in October 2004, the Association's engineering firm wrote a letter to the Association stating that the work had been completed according to its recommendations.

¶ 6. Meanwhile, in July 2003, Maroldt wrote a letter to the Office of Professional Regulation making allegations against Ring

in connection with his work on the condominium units. In March 2005, the Vermont Board of Professional Engineering filed various charges against Ring, all of which were eventually dismissed following a hearing before the board. In May 2005, after Ring had applied for a certificate of occupancy, the Association's attorney wrote a letter to the zoning administrator questioning whether the town could issue a permit for a structurally unsound project such as Ring's appeared to be. The superior court later found that defendants intended the letter to make it as cumbersome and expensive as possible for Ring to get his certificate of occupancy. In the end, despite defendants' efforts to thwart his project, Ring was eventually able, with the aid of an attorney, to renew his zoning permit, which had expired in December 2003, and to obtain a certificate of occupancy.

¶ 7. In July 2006, Ring sued the Association and some of its members, alleging that they had, by their conduct since the March 2003 jury verdict, violated the express terms of the 2001 settlement agreement and its implied covenant of good faith and fair dealing. Ring sought compensatory and punitive damages, as well as attorney's fees. Defendants asserted several counterclaims on a variety of theories. On April 2, 2012, following an eleven-day bench trial, the superior court determined that Ring was entitled to $1230 in compensatory damages and $3000 in punitive damages from Maroldt.

¶ 8. In arriving at this decision, the court found a "shared responsibility for David Ring's troubles in undertaking and completing his project." According to the court, Ring's questionable purchase of declarant's development rights, although seemingly resolved by the 2001 settlement agreement, festered and established a tone of mistrust. For their part, although defendants had legitimate concerns about the structural impacts of Ring's project and were understandably put off by Ring's initial reluctance to discuss his plans to address those concerns, they continued their efforts to thwart his project long after the structural concerns had been addressed to the satisfaction of the state and their own engineering firm. In determining that defendants had violated the settlement agreement's implied covenant of good faith and fair dealing, the court found that defendants repeatedly engaged in actions to harass Ring and obstruct his project, even after their legitimate concerns were satisfactorily addressed, despite their promise to allow the project's completion in exchange for his

relinquishment of the declarant's development rights. The court concluded that these actions undermined Ring's right to receive the benefit of the settlement agreement.

¶ 9. The court, however, rejected Ring's request for nearly $45,000 in compensatory damages because the requested amount included work that was not the result of the breach found by the court and because Ring had used an unreasonably inflated hourly rate to calculate the damages. Regarding Ring's claim for punitive damages, the court concluded that Maroldt's conduct warranted an award of $3000, but that the actions of the Association and Beck "were neither outrageous nor malicious enough to warrant punitive damages," given Ring's own role in fomenting a mistrust and ill will among the parties. The court acknowledged that Morrison, Beck's late husband and business partner, had, along with Maroldt, continued the fight against Ring long after any legitimate concerns over Ring's project had been resolved; the court, however, noted that Morrison's estate had not been made a party to the suit and expressed its belief that the estate could not be held liable for punitive damages.[2]

¶ 10. In response to Ring's motion to amend, the court increased Ring's compensatory award to $4000 and considered whether Beck could be held liable for any punitive damages assessed based on Morrison's conduct. The court stated that it was mistaken in assuming that Morrison or his estate had been effectively dismissed from the case, noting that Ring had consented to substituting Beck and the Association for Morrison "for all purposes in this action." The court stated that, pursuant to the substitution order, Beck would stand in Morrison's shoes for all purposes, including the imposition of punitive damages. The court then went on to find that Morrison had acted in bad faith in making repeated attempts to halt or delay Ring's project by resurrecting issues that had been resolved and making claims that had no basis in fact, thereby warranting a punitive damages award against him in an amount to be determined following a hearing. The court reiterated that Beck would be liable for punitive damages attributable to Morrison, but noted that although Beck signed documents as an Association member and

---

[2] We have not decided "the question of whether punitive damages can ever be rightfully awarded against an estate." *Carpentier v. Tuthill*, 2013 VT 91, ¶ 19 n.*, 195 Vt. 52, 86 A.3d 1006.

voted with Morrison and Maroldt at Association meetings, her own conduct, in and of itself, did not exhibit the type of malice or ill will warranting punitive damages.

¶ 11. The superior court later issued two more decisions regarding punitive damages. In the first one, the court concluded that no judgment could be entered against Morrison or his estate for punitive damages, and that Beck could not be liable for punitive damages attributable to Morrison's conduct based on the substitution order, as it had previously determined, because such an order under Vermont Rule of Civil Procedure 25 is procedural in nature and does not create survival rights or liabilities. Nevertheless, the court determined that Beck should be held jointly and severally liable as her late husband's business partner because she and Morrison "together as a partnership plotted against Mr. Ring, voted in meetings, and made demands on Mr. Ring in the course of the development of his project." The court further stated that Beck, as Morrison's partner in their jointly held condominium units, "went along with all the actions Mr. Morrison took to obstruct the process." In a second subsequent decision on punitive damages, the court increased the award based on Maroldt's conduct from $3000 to $8000 and established an award of $24,000 for Morrison's conduct, for which the court found Beck liable. Thus, the court's final damage award was $36,000 — $4000 in compensatory damages and $32,000 in punitive damages.

¶ 12. The superior court also issued multiple decisions on Ring's motion for attorney's fees and costs, which he submitted one month after the court's April 2, 2012 decision. In its first decision, the court rejected Ring's request to recover attorney's fees and costs incurred before commencement of the instant litigation. The court acknowledged that most of the fees could have been included in Ring's request for damages because they related to defendants' breach of the 2001 settlement agreement, but concluded that they could not be recovered in a post-trial request for attorney's fees under Vermont Rule of Civil Procedure 54(d)(2)(A) because they were not "in connection with a pending action."

¶ 13. On August 15, 2013, the superior court issued its principal decision on attorney's fees. The court concluded that Ring was entitled to attorney's fees as the only prevailing party, and that the language of the settlement agreement entitled him to reasonable fees. The court rejected Ring's argument that he was entitled to all of his requested attorney's fees pursuant to the settlement

agreement unless defendants could prove that the fees were excessive. Rather, according to the court, notwithstanding the provision in the agreement requiring the unsuccessful party in any necessary legal action to pay "all" legal fees and costs, Ring was entitled to only those fees that he demonstrated were reasonable in the context of the litigation.

¶ 14. Ring sought approximately $350,000 in attorney's fees. Based on its line-by-line review of the accompanying affidavits and its examination of three banker's boxes of documents concerning the case, the court awarded Ring $90,000 in attorney's fees representing an estimated $50,000 for what should have been sufficient to recover provable damages in the case, plus an estimated $40,000 in additional fees resulting from a defense to the suit beyond what was necessary.

¶ 15. In limiting the attorney's fees award to $90,000, the court found that Ring's lawsuit was driven primarily by revenge — its purpose was more to punish defendants than to recover any financial loss — and that the fees were excessive and unnecessary in comparison to the damages requested and particularly those ultimately rewarded. In his motion for reconsideration, Ring objected to the court's characterization of his motive for the lawsuit, but the court stated that it would not change the award even if it withdrew its characterization of Ring's motives in filing the lawsuit. The court concluded that the litigation expenses in the case escalated out of control beyond all justification, considering the damages appropriately attributable to defendants' behavior and other factors.

¶ 16. In another decision, the court ordered defendants to pay costs of approximately $4000, but denied prejudgment interest on the award of attorney's fees and costs, concluding that those damages were unliquidated. The court issued its final judgment on September 24, 2013, awarding Ring $4000 in compensatory damages, $32,000 in punitive damages, $90,000 in attorney's fees, approximately $4000 in costs and expenses, and post-judgment interest.

¶ 17. Ring appeals, arguing that the superior court erred by: (1) not awarding him all of his legal fees and costs in accordance with the terms of the parties' 2001 settlement agreement; (2) denying his request for pre-litigation attorney's fees; and (3) denying his request for prejudgment interest on his compensatory damage and attorney's fee awards. He also argues that the court violated

his constitutional right to a certain remedy by arbitrarily reducing his contractually guaranteed attorney's fee award and denying his request for prejudgment interest. Beck cross-appeals, arguing that the superior court erred by: (1) awarding punitive damages without finding that defendants engaged in criminal or fraudulent conduct; (2) not making sufficient findings or conclusions to support that award; and (3) holding her responsible for the punitive damages attributable to the conduct of her late husband and business partner.

## II. Attorney's Fees

### A.

¶ 18. Ring first argues that the superior court employed the wrong legal standard in considering his claim for attorney's fees. According to Ring, in lieu of the lodestar method, the court should have applied a nondiscretionary plain-meaning rule that compelled it to award fees according to the parties' unambiguous agreed-upon contractual provision mandating that the unsuccessful party pay all legal fees and court costs. We conclude that the court appropriately applied the lodestar method in considering Ring's request for attorney's fees.

¶ 19. ■ Parties are normally responsible for their own attorney's fees unless there is "a statute or agreement that provides otherwise." *Huard v. Henry*, 2010 VT 43, ¶ 11, 188 Vt. 540, 999 A.2d 1264 (mem.). In this case, the parties' 2001 settlement agreement provided that if either party reneged on the agreement, resulting in necessary legal action, "the unsuccessful party will pay all legal fees and court costs." Defendants do not dispute the superior court's determinations that Ring was the successful party and that legal action was necessary to vindicate his rights under the parties' agreement.

¶ 20. ■ Generally, in determining a reasonable attorney's fee award, courts should begin by calculating the "lodestar" amount — the number of hours reasonably spent on the case times a reasonable hourly rate. *Id.* "Once the court arrives at a lodestar amount, the court can then adjust the number upward or downward based on a number of factors, including the novelty of the legal issue, the experience of the attorney, and the results obtained in the litigation." *Id.* (quotation omitted). Because the

court's award is based on the specific facts of each case, "we grant the trial court wide discretion in making that determination." *Id.* (quotation omitted).

¶ 21. ▇ Ring contends, however, that because the parties' contractual provision on legal fees explicitly requires the unsuccessful party to pay "all" fees, the trial court must award all fees expended unless defendants demonstrate that the fees are excessive. We decline to diverge from the lodestar method in cases involving contractual provisions on attorney's fees or to abandon our general principles placing upon the requesting party "the burden to provide evidence of services upon which value can be determined," *Bruntaeger v. Zeller*, 147 Vt. 247, 254, 515 A.2d 123, 128 (1986), and giving the trial court wide discretion in determining the reasonableness of the requested fees. See *Monmouth Meadows Homeowners Ass'n v. Hamilton*, 7 A.3d 1, 5-6 (Md. 2010) (stating that party requesting attorney's fees "has the burden of providing the court with the necessary information to determine the reasonableness of the request" (quotation omitted)). We find unpersuasive those decisions suggesting that trial courts have an unspecified limited amount of discretion to determine the reasonableness of fees awarded pursuant to contract. See, e.g., *United States v. W. States Mech. Contractors, Inc.*, 834 F.2d 1533, 1549-50 (10th Cir. 1987) (stating that where attorney's fees are granted by contract, court has discretion to determine whether fees are inequitable or unreasonable but may not independently calculate what it believes to be reasonable fee); *McDowell Mountain Ranch Cmty. Ass'n v. Simons*, 165 P.3d 667, 671-72 (Ariz. Ct. App. 2007) (stating that although court may not award unreasonable fees granted by contract, its "discretion is more narrowly circumscribed when the parties contractually agree that the prevailing party shall be awarded all its attorneys' fees").

¶ 22. ▇ Notwithstanding Ring's suggestion to the contrary, this Court has never adopted a plain-meaning rule that replaces the lodestar method in cases involving contractual provisions on attorney's fees. We did not supplant the lodestar method with such a rule in *Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 12, 182 Vt. 196, 932 A.2d 1045, but rather merely stated that we would rely on the plain meaning of the parties' written agreement on attorney's fees rather than resort to extrinsic evidence. The parties' agreement that the unsuccessful party would be respon-

sible for paying "all" fees does not suggest that the trial court is precluded from considering the reasonableness of the fees requested. See *Zenner v. Holcomb*, 210 P.3d 552, 559 (Idaho 2009) (cautioning "that contractual language such as . . . 'all attorneys fees' does not give the prevailing party an unqualified right to unlimited attorney fees"); *McMullen v. Kutz*, 985 A.2d 769, 776-77 (Pa. 2009) (joining majority of states "in finding that parties may contract to provide for the breaching party to pay the attorney fees . . . , but that the trial court may consider whether the fees claimed to have been incurred are reasonable, and to reduce the fees claimed if appropriate"). In effect, we infer from the contracting parties' agreement that the unsuccessful party is responsible for paying only reasonably incurred fees. See *Myers v. Kayhoe*, 892 A.2d 520, 532 (Md. 2006) ("Even in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness."). In short, the court did not apply the wrong legal standard.

## B.

¶ 23. Ring further argues, however, that even assuming the lodestar method was the appropriate method to use, the superior court erred in executing that method by not identifying sound reasons for imposing such a drastic discount on the requested fees, by implicitly presuming the necessity of proportionality between damages and attorney's fees, and by failing to make adjustments from an identified lodestar figure based on established law. We reject each of these arguments.

¶ 24. As noted, Ring requested approximately $350,000 in attorney's fees. In its detailed twenty-seven-page decision on attorney's fees, the superior court first determined, following an initial line-by-line examination of the affidavits submitted in support of the requested fees, that the rates were reasonable and that the time recorded was actually expended, but that approximately $35,000 of the fees were for services tangential to the litigation or plainly excessive and thus should not be allowed. The court then undertook an extensive review of each of the nine file folders in three bankers boxes containing documents from the case, including over one hundred motions. In examining the files, the court commented on various motions and other filings. The court noted in particular Ring's unsuccessful motion for summary judgment

and the comments made by the deciding judge, who made it clear that she thought the motion was a waste of everyone's time and money. The court referred to other futile motions by Ring, including an effort to have the earlier denial of his ill-advised motion for summary judgment overturned. As the superior court pointed out, multiple judges in the case commented on Ring's overwritten and unhelpful filings, and the trial court opined that the eleven-day trial was unnecessarily long.

¶ 25. The court then considered each of the so-called *Johnson* factors for adjusting the lodestar figure upward or downward. See *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 9 A.3d 672 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). The court concluded that most of those factors were not helpful, but found, in examining the factors, that: (1) there was nothing novel about the case; (2) the case did not require exceptional legal skill; (3) the litigants were at war with each other and were willing to spend any amount of money to prevail, even if it meant destroying any reasonable financial remedy available; (4) the attorneys fell into the trap of exacerbating their clients' hostility toward one another and engaging in aggressive litigation through a wasteful motion practice; and (5) this case is unique because the level of hostility was so high and the filings were so excessive.

¶ 26. The court agreed with Ring that the law does not require proportionality between attorney's fees and damages, but concluded that the absence of a favorable result could be a factor in determining the appropriate amount of compensation for attorney's fees. The court noted the limited potential and actual damages in this case, and found no justification for the exorbitant fees expended. The court acknowledged that there was no formula for precisely calculating the appropriate level of a fee award, but concluded that a limited award was appropriate here because of the level of excessive filings and litigation driven more by animosity toward the other side than obtaining a reasonable financial remedy. The court concluded that $50,000 should have been sufficient to recover any provable damages in this case, but that the award would be increased to $90,000 because of the role defendants played in increasing the costs of the litigation.

¶ 27. ■ ■ We reject Ring's argument that the superior court misapplied the lodestar method. While the court arrived at a

lodestar figure before making additional adjustments based on a determination of the reasonableness of all the hours expended on the case, the court ultimately made a highly discretionary determination of what amount of the prevailing party's fees were reasonably necessary to prosecute the lawsuit. The "touchstone" of the lodestar inquiry is reasonableness, *Huard*, 2010 VT 43, ¶ 14, and that was the court's focus.

¶ 28. We also reject Ring's argument that the court did not adequately explain its award. After an exhaustive examination of the record, the trial court gave sound reasons for the limited award, while ultimately having to make an imprecise judgment call. This case is similar to *Huard*. There, the prevailing plaintiffs argued that the court provided vague, nonspecific reasoning in justifying deductions to their requested fees. We upheld the award because, even though the court did not itemize what hours it deducted, it did a painstaking accounting of inefficiencies in the attorneys' work. *Id.* ¶¶ 13-14. Moreover, we expressly held that the court did not err in factoring in the plaintiffs' retributive motives and the limited results they obtained through the litigation. *Id.* ¶¶ 15-17.

¶ 29. Nor did the superior court err in considering the potential damages and those actually proved in comparison to the fees expended. The question "is not whether the attorney's fee award is proportional to the damages, but rather whether the fee award is reasonable given the demands of the case." *Kwon v. Eaton*, 2010 VT 73, ¶ 20, 188 Vt. 623, 8 A.3d 1043 (mem.). There may be certain cases, civil rights cases for example, where the damage award is relatively small but the overall impact and reach of the decision is significant, thereby justifying an award of attorney's fees far in excess of the compensatory damages awarded. That is not the case here, however, where the court explained why the requested fees were not reasonable given the demands of the case.

## C.

¶ 30. Ring also argues that the superior court erred by denying him his pre-litigation attorney's fees — specifically $8685 expended in connection with his efforts to obtain his certificate of occupancy and $14,122 expended in connection with his defense of the attack on his engineering license. Following the superior

court's April 2012 decision, Ring filed a post-trial motion pursuant to Rule 54 to recover attorney's fees and costs. One section of the motion dealt with attorney's fees incurred prior to the present litigation.

¶ 31. In a May 8, 2013 decision, the superior court denied pre-litigation attorney's fees. The court reasoned that because the attorney's fees were incurred in previous proceedings related to defendants' alleged breach of the 2001 settlement agreement and had been paid before the instant litigation commenced, they were in the nature of damages to be claimed and proved at trial in this case, not attorney's fees "in connection with" the pending action to be requested following final judgment. See V.R.C.P. 54(d)(2)(A) ("Claims for attorneys' fees for services rendered in connection with a pending action . . . shall be made by motion in the action unless the applicable substantive law provides for the recovery of such fees as an element of damages to be proved at trial or in an independent action."). The court also concluded that Ring was not entitled to the fees incurred in proceedings before the Office of Professional Regulation because of its determination that defendants, and particularly Maroldt, did not breach the warranty of good faith and fair dealing by writing the letter that instigated that proceeding.

¶ 32. Ring argues that the superior court erred because this Court has held that, absent a contractual agreement to the contrary, deciding the amount of attorney's fees post-trial is permissible, indeed "more efficient because the evidence need be presented only if the party seeking the award prevailed on the merits." *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 162, 761 A.2d 688, 701 (2000). In *Murphy* the trial court denied the prevailing parties' request for attorney's fees incurred in that litigation and recoverable by contract because the parties failed to submit the issue to the jury as an element of damages. We reversed the superior court's ruling because: (1) the trial judge "is better equipped than the jury to determine the appropriate" amount of attorney's fees; (2) "[d]eciding the amount of fees post-trial is more efficient because the evidence need be presented only if the party seeking the award prevailed on the merits"; and (3) "post-trial adjudication is the only way to account fully for the legal services provided." *Id.*

¶ 33. ■■ ■■ Because *Murphy* did not concern pre-litigation attorney's fees, the case is not on point. The first and third

reasons stated in the decision do not apply at all, and the second reason would be true of all damages claimed at a trial — you do not get them if you do not prevail. We agree with the trial court that the pre-litigation attorney's fees that Ring claimed, which were alleged to have resulted from defendants' breach of the settlement agreement and had already been paid prior to the instant litigation, were more in the nature of damages that should and could have been proved at trial. Accordingly, we find no error in the court's refusal to consider those damages by post-trial motion.

## III. Prejudgment Interest

¶ 34. Next, Ring argues that the superior court erred by denying him prejudgment interest on his compensatory damages and attorney's fees. The award of prejudgment interest is governed by Vermont Rule of Civil Procedure 54(a), which provides that "the amount of the judgment shall include the principal amount found to be due, all interest accrued on the amount up to and including the date of entry of judgment, and all costs allowed to the prevailing party." Prejudgment interest is mandatory when the damages are liquidated or readily ascertainable at the time of the tort and is "discretionary in other cases." *Estate of Fleming v. Nicholson*, 168 Vt. 495, 501, 724 A.2d 1026, 1030 (1998); accord *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶ 36, 182 Vt. 349, 940 A.2d 674. Regarding the mandatory awards, "Rule 54 does not require that the amounts be precisely or infallibly ascertainable, only that they be reasonably so." *Smedberg*, 2007 VT 99, ¶ 38. "The principal rationale for an award of prejudgment interest as of right is that, where damages are liquidated or determinable by a reasonably certain standard of measurement, the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages." *Agency of Natural Res. v. Glens Falls Ins. Co.*, 169 Vt. 426, 435, 736 A.2d 768, 774 (1999) (quotation omitted).

¶ 35. ■ Here, the superior court ruled that prejudgment interest was not mandatory because the compensatory damages were neither liquidated nor readily ascertainable at the time of the breach. Further, the court also declined a discretionary award of prejudgment interest, concluding that it was not necessary to make Ring whole. The court also declined to award prejudgment

interest on the attorney's fees award because those fees are not liquidated until fixed by the trial court. See *Salatino v. Chase*, 2007 VT 81, ¶ 15, 182 Vt. 267, 939 A.2d 482 (noting general conclusion of courts that "for purposes of prejudgment-interest awards, . . . attorney's fees are not liquidated until fixed by the trial court following discretionary calculations").

¶ 36. ▮ Ring does not contest the fact that the damage and attorney's fee awards are unliquidated; rather, he briefly states that the superior court abused its discretion by not awarding him prejudgment interest because the purpose of prejudgment interest is to restore the injured person to the position that the person would have been in absent the harm. We find no abuse of discretion. The superior court detailed what it considered to be the shared responsibility for the excessive litigation in this case and acted well within its discretion in denying prejudgment interest for damages that it considered to be not liquidated or readily ascertainable at the time of the breach.

¶ 37. ▮ Finally, we reject Ring's attempt to constitutionalize his contractual claims of error by contending that the superior court's discretionary decisions on his request for attorney's fees and prejudgment interest deprived him a complete remedy in violation of Chapter I, Article 4, of the Vermont Constitution. According to Ring, the court violated his right to access to the courts by arbitrarily limiting his attorney's fees award based on it attributing to him retributive motives in filing his lawsuit. We have already reviewed the superior court's award and determined that the court acted within its discretion based on the facts and circumstances of this case. There is no constitutional right to recover all attorney's fees incurred, irrespective of their reasonableness.

## IV. Punitive Damages

### A.

¶ 38. We now turn to Beck's cross-appeal, in which she challenges the superior court's punitive damages award. She first argues that the court erred by awarding punitive damages without making sufficient findings and conclusions to support the award. Specifically, she contends that the court committed reversible error by awarding punitive damages in a contract action without

finding that defendants engaged in criminal or fraudulent conduct. According to Beck, the superior court based its punitive damage award solely on an incorrect perception of malice and omitted any finding of fraudulent or criminal conduct.

¶ 39. We disagree. We have never stated that the award of punitive damages in contract actions requires a showing that the defendants' conduct met the elements of fraud or amounted to a crime. Rather, it is settled law in Vermont "that punitive damages are appropriate in contract actions in certain extraordinary cases where the breach *has the character of* a willful and wanton or fraudulent tort." *Ainsworth v. Franklin Cnty. Cheese Corp.*, 156 Vt. 325, 331, 592 A.2d 871, 874 (1991) (quotation omitted). A plaintiff must show actual malice on the defendants' part — as evidenced by conduct exemplifying personal ill will or showing a reckless or wanton disregard for the plaintiff's rights — and also that the defendants' actions were "akin to a willful and wanton, or fraudulent, tort." *Murphy*, 171 Vt. at 155, 761 A.2d at 696.

¶ 40. Here, the trial court found that Maroldt and Morrison acted in bad faith by misrepresenting to government officials that Ring's project was potentially unsafe at a time when they knew that it had been approved by the state and certified as safe by their own engineer. They did so, according to the court, out of their animosity towards Ring to make it as difficult and expensive as possible for him to obtain his certificate of occupancy, despite their agreement not to oppose the project if it was deemed structurally safe. These actions were akin to fraudulent conduct and demonstrated not only personal ill will but also a willful disregard of Ring's rights. We conclude that the evidence and the court's findings and conclusions support its punitive damages award. Cf. *Ainsworth*, 156 Vt. at 329, 332, 592 A.2d at 873, 875 (finding no error in submitting punitive damage issue to jury where employee alleged that employer fabricated grounds for termination to deny severance package); *Appropriate Tech. Corp. v. Palma*, 146 Vt. 643, 648, 508 A.2d 724, 727 (1986) (concluding that record supported award of punitive damages where employer knowingly misrepresented its finances to induce employee to leave his job); *Glidden v. Skinner*, 142 Vt. 644, 647-48, 458 A.2d 1142, 1144-45 (1983) (concluding that punitive damages were warranted where defendants induced plaintiffs to sell cows from another farm and work long hours on defendants' farm without compen-

sation even though they knew that they were not going to go through with sale of farm to plaintiffs).

¶ 41. In a similar vein, Beck argues that defendants, in particular Maroldt and Morrison, were merely exercising their right to register their concerns and disputes with Ring's construction, albeit in an annoying and pestering manner, and that the court utterly failed to make findings demonstrating otherwise. Again, we disagree. The court provided a detailed account, including citation to exhibits, of what actions defendants took to thwart the approval of Ring's project based in part on questions concerning its structural safety, even though they knew that those questions had been adequately addressed and that the project had been approved by the state and their own engineer.[3]

## B.

¶ 42. Finally, Beck argues that the superior court erred by making her liable for punitive damages awarded against Morrison based on a partnership theory. According to Beck, although the court could arguably hold her liable for compensatory damages assessed against Morrison due to their partnership, there is no basis in law or fact to hold her liable for punitive damages that were assessed based on Morrison's purportedly malicious conduct.

¶ 43. ▪▪▪ We conclude that the superior court did not err by holding Beck liable for punitive damages assessed based on Morrison's conduct. Beck cites no case law to support her position, despite the fact that the superior court carefully examined the relevant law. "Generally, the courts have held that a partner who did not authorize, participate in, or ratify the wrongful act of [a] copartner is not liable for punitive damages awarded in connection with the partner's wrongful act, although there is authority to the contrary, particularly in cases involving fraud." M. Rosenhouse, Annotation, *Derivative Liability of Part-*

---

[3] Beck does not argue that the superior court's findings and conclusions are unsupported by the record. Nor could she do so, considering that she ordered no transcripts for this appeal, and the only transcript ordered by Ring was a June 2012 nonevidentiary motion hearing that did not focus on punitive damages. As indicated herein, the trial court made numerous findings regarding Morrison's actions in unreasonably obstructing Ring's project and Beck's acquiescence and participation in those actions as his business partner and fellow member of the Association.

*ner for Punitive Damages for Wrongful Act of Copartner*, 14 A.L.R.4th 1335, 1336 (1982).

¶ 44. The courts have divided, however, on the impact of the Uniform Partnership Act on this general rule. A provision of the 1997 Uniform Partnership Act adopted in Vermont states that a "partnership is liable for loss or injury . . . or for a penalty incurred" as the result of a partner's actionable conduct in the ordinary course of the partnership's business or with the authority of the partnership. 11 V.S.A. § 3225(a). We agree with the superior court that this provision neither differs materially from, nor adds any clarification to, the equivalent former provision under the 1914 Uniform Partnership Act with respect to the question of whether a partnership is liable for punitive damages assessed based on the conduct of one of the partners. See 11 V.S.A. § 1205 (repealed in 1999) (stating that partnership is liable for "loss or injury" or for "any penalty incurred" as result of any partner acting in ordinary course of partnership business or with authority of copartners).

¶ 45. Courts construing the former act have fallen generally into two camps. The first one holds that under the plain meaning of the statutory provision all partners are jointly liable for punitive damages assessed against any partner acting within the scope of the partnership's business, notwithstanding the other partners' lack of culpability. See, e.g., *Winant v. Bostic*, 5 F.3d 767, 775 (4th Cir. 1993) (finding partner derivatively liable for punitive damages for his partner's acts under North Carolina uniform partnership provision because acts were carried out in ordinary course of partnership business); *Blue v. Rose*, 786 F.2d 349, 352 (8th Cir. 1986) (upholding punitive damages award because under Missouri law "members of a partnership are liable for torts committed by any member acting in the scope of the partnership's business, even if they do not participate in or have knowledge of the tort"). The other camp holds that partners are not derivatively liable for punitive damages attributable to another partner without having authorized, ratified, controlled, or participated in the tortious acts. See, e.g., *In re WPMK Corp.*, 59 B.R. 991, 997 (D. Haw. 1986) (holding under Hawaii law that partnership is not liable for punitive damages incurred by one of its partners unless it authorized, controlled, or participated in tortious act or ratified it by accepting benefits from act with actual or constructive knowledge of facts); *Duncan v. Henington*, 835 P.2d 816, 819 (N.M. 1992) (holding under partnership statute that only partners who

participated in tortious act may be held jointly liable for punitive damages).

¶ 46. The courts have arrived at their differing holdings depending on their common law of derivative liability, particularly with respect to principal and agent. *Duncan*, 835 P.2d at 818. Here, noting that this Court has adopted § 909 of the Restatement (Second) of Torts, which sets forth conditions in which punitive damages can be awarded against a principal for the tortious acts of an agent, the superior court ruled that partners cannot be liable for the tortious acts of a partner unless they authorized, ratified, controlled, or participated in the acts. See *Sweet v. Roy*, 173 Vt. 418, 444-45, 801 A.2d 694, 713-14 (2002) (citing Restatement (Second) of Torts § 909 (1979) as establishing relevant elements necessary for imposing punitive damages against principal based on agent's tortious act); cf. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 907 P.2d 506, 514-15 (Ariz. Ct. App. 1995) (noting that Arizona specifically rejected § 909 of Restatement and holding that its partnership statutes permitted punitive damages to be awarded vicariously to all partners as long as tortious act was performed in ordinary course of partnership's business). Nevertheless, the court concluded that Beck should be held liable for the punitive damages awarded based on Morrison's behavior because they plotted against Ring together as a partnership, made unreasonable demands on Ring in the course of the development of his project, and voted at Association meetings to take actions that unfairly obstructed Ring in obtaining a certificate of occupancy.

¶ 47. Without needing to construe § 3225(a), we concur with the superior court's judgment that, given the particular circumstances of this case, it is appropriate to hold Beck liable for the punitive damages attributable to her late husband and business partner because: (1) their partnership revolved around their ownership of several condominium units within the Association that, led by Maroldt and Morrison, unreasonably opposed Ring's project on his condominium units; (2) Beck was aware of the obstructive actions taken by her partner and the Association; and (3) she participated in those actions as a partner and a member of the Association by voting to take steps to oppose Ring's certificate of occupancy long after issues concerning his project's structural safety were resolved.

¶ 48. The basis of the partnership found by the superior court was Beck's and Morrison's joint ownership of four of the Carriage House Condominium units, one of which was in the same building as Ring's units. As joint owners of those four units, they participated in the Association's unreasonable actions against Ring, which were instigated by Maroldt and Morrison. As found by the court, by the end of 2003, Morrison and the other Association members were fully aware that there were no longer any legitimate structural issues regarding Ring's project, and yet they persisted in obstructing Ring's certificate of occupancy and renewal of his building permit, despite the Association's promise not to oppose the project if issues surrounding its structural safety were adequately addressed. The court found that although Beck was not an instigator in the continued bad faith opposition to Ring's project, like her husband and partner Morrison, she participated in that opposition as Morrison's business partner and as a member of the Association, signed several of the documents in that respect, and voted along with Morrison and Maroldt at Association meetings. That participation was sufficient for the court to hold her liable for punitive damages attributable to Morrison's actions.

*Affirmed.*

