VERMONT SUPERIOR COURT

Orange Unit

5 Court Street

Chelsea VT  05038

802-685-4610

www.vermontjudiciary.org

CIVIL DIVISION

Case No. 23-CV-05031



| Eric Thorp et al v. Vanilla-Clove Moonstone |
| --- |

## FINDINGS, CONCLUSIONS, AND JUDGMENT

This is an ejectment action.  Plaintiffs Eric and Lynn Thorp rented a dwelling unit to Defendant Vanilla-Clove Moonstone at 11 Thorp Road in South Strafford, Vermont, beginning on June 1, 2018.  Plaintiffs began this ejectment action in December 2023, and Ms. Moonstone was removed from the house pursuant to a Writ of Possession issued on September 19, 2024.  This matter came to trial on March 10, 2025 on the sole issue of damages and attorney's fees under 12 V.S.A. § 4854.  Based on the evidence and exhibits, the Court makes the following findings and conclusions.

### Factual Findings

The property at issue in this case is a single-family residence and adjoining three acres located at 11 Thorp Road in South Strafford, Vermont.  Defendant Moonstone began renting the property from the Thorp Plaintiffs in June of 2018 and occupied it

continuously until her removal in September of 2024.  At the time she entered into the lease, Defendant provided a security deposit of $1,000.  Under the terms of the original lease, Defendant was required to pay $1,800 per month in rent.  When the lease was renewed, the rent remained the same.  Rent remained at $1,800 until October 2022, when it increased to $2,200 per month.  In June 2023, Plaintiffs increased the rent to $2,300.  Plaintiffs gave Defendant more than 60 days of notice for each of these rent increases.

*Unpaid Rent and Security Deposit*

Defendant paid her monthly rent regularly until July of 2023. After that, she made rent payments sporadically.  As of the termination of her tenancy, pursuant to the Court's September 2, 2024 Rent Escrow Order, Defendant had not paid for 9 months of rent at a rate of $2,300 per month for a total unpaid rent total of $20,700.

Following Defendant's removal from the property, Plaintiffs filed a timely notice of withhold of the security deposit, which they seek to apply to the rent and unpaid damages.  Plaintiffs also seek a 10% late fee charge pursuant to the lease, which they calculate would equal $2,070.  This late fee is not associated with any out-of-pocket costs for Plaintiffs but simply represents the aggravation of dealing with untimely payments.

*Damages Beyond Normal Wear and Tear*

The bulk of Plaintiffs' case concerns damages to the house that they found upon taking possession of the property at the end of September 2024.  These include:  (1) the

deck on the house being covered in dog feces and urine; (2) claw marks on trim and multiple urine spots in the house and mold in the basement on walls where dogs urinated; (3) feces in the basement; (4) broken hot water heater; (5) broken faucet in the master bedroom; (6) melted wax throughout the house; (6) broken toilet in main bathroom; (7) broken screens; (8) wallpaper removed from the bathroom; (9) removal of all flowers from the flower bed; and (10) failure to re-fill the fuel tank to the level she received it.

Plaintiffs testified that these damages occurred during Defendant's tenancy and have left the property unrentable. Plaintiff Eric Thorp testified that he has incurred over $20,000 in expenses to date including the rental and disposal of material in a 30-yard dumpster for $1,600; new materials in the amount of $2,400; costs of demolition, and initial repairs. Plaintiffs' contractor Ross Johnson testified that final repairs to the property would equal or exceed $115,000. Neither Plaintiff nor Mr. Johnson submitted a breakdown of this cost estimate or an explanation for the source of these expenses.

Defendant Moonstone denies these allegations. She testified that the mold damage in the basement was due to ground water seeping into the basement. Defendant testified that she notified informed Plaintiffs several times about the water damage, but she claims that they took no action. Defendant also testified about the deck. She stated that it was an older deck that appeared to be failing when she started to rent the property and that without repairs or maintenance, it simply became more dilapidated. Defendant's witness James Marcroft, who helped her move out of the property, stated that he did not

see any dog waste on the deck, and it looked to him simply like an old deck that had probably been installed in the 1980s and had not been maintained or repaired.

Defendant submitted several photographs of the basement. The pictures portray a damp basement with water and high humidity. There is a picture of a basement refrigerator that shows signs of high humidity in its rust and deterioration. The pictures showing mildew of the walls also show a uniform pattern. The mildew runs up the walls at regular intervals with a column-like shape. The Court finds that the most reasonable explanation is that there is source of water at each of these points that wicks up the drywall, which provides the conditions for mildew growth.

Plaintiffs provide credible testimony that the upstairs of the house had extensive dog damage including claw marks on the trim and urine on the carpet and rugs. There was also testimony of finding melted wax throughout the house. Plaintiffs also provided evidence that there was a broken faucet in the master bathroom, a broken toilet in the main bathroom, broken screens throughout the house, and that wallpaper has been removed from the bathroom.

There was also evidence of a broken hot water heater, but Defendant put on credible evidence that this resulted from normal wear and tear and was reported to Plaintiffs in a timely manner. As such, the Court does not allow this damage. Similarly, there appears to be little dispute regarding changes that Defendant made to the flower beds, but the Court finds that this action was within Defendant's ability to control and use the premises around the house. As such, this damage is not allowed.

The Court finds that Defendant testified that she notified Plaintiffs of several defects that were not repaired in a timely manner or at all. The Court finds that there is no credible evidence that there were communications between the parties about ongoing defects. While Defendant testified as to making these claims, they appear to be isolated and singular complaints without documentation or evidence of follow-up. There is no record of reducing the complaints to writing or making any type of written notice that would have squarely put Plaintiffs on notice as required under 9 V.S.A. § 4458. As well, the evidence indicates that whatever defects existed, they did not interfere with Defendant's ability to occupy and use the property. In short, there is no evidence that any defect was clearly raised to Plaintiffs, for which they refused to make repairs, and which, in turn, prevented Defendant from occupying or using the property. As such, the Court finds no basis for Defendant to withhold rent or offset any claims for damages.

Finally, Plaintiffs provided credible testimony that Defendant left the fuel tank for the house empty after having received a half-full tank. As a result, Plaintiffs have incurred $500 in damages to refill the tank to the same level that Defendant received. The Court awards this damage to Plaintiffs.

A large part of Plaintiff's damages and costs appear to arise from the allegation that excessive dog feces, urine, and mold ruined the deck on the house. Mr. Johnson testified that the deck was structurally compromised by these issues and would have to be re-built or substantially refurbished as it is presently failing. The Court finds that Plaintiffs have not sustained their burden on this issue. Neither Plaintiff nor Mr. Johnson

provided pictures or a specific explanation as to why excessive dog waste would cause the failure of the deck. The Court also finds Defendant's testimony credible on two points. First, this was an older deck that had been installed at least 20 to 30 years before Defendant took possession. Second, there is no evidence that Plaintiffs maintained this deck or did any preventative work or repairs during Defendant Moonstone's five-year tenancy. As such, the Court finds it more credible and more likely that the deck failed due to age and natural deterioration. While the Court finds the testimony concerning dog waste credible, it finds that this waste was at most an accelerant and not a main cause for the deterioration. Given that Plaintiff has not put forward any substantial causative evidence, the Court finds that there is not enough evidence to conclude that Defendant was responsible for the collapse and loss of the deck.

As to the basement walls, the Court had testimony from both parties and pictures submitted by Defendant. The Court finds based on the evidence that the theory that dog urine caused the mold is at most a possibility but not the probable cause of the mold. The pattern of the mold reflects more uniform water distribution and absorption, and the evidence indicates that basement was regularly wet and humid. As with the deck, the Court finds Plaintiffs' testimony that there was dog urine in the basement to be credible, but it does not find that Plaintiffs have connected the presence of urine to specific mildew areas or patterns.

For these reasons, the Court does not find a basis to award Plaintiffs for either the deck or the basement damages.

23-CV-05031 Eric Thorp et al v. Vanilla-Clove Moonstone

As to the remaining damages, the Court does find that Plaintiffs have demonstrated a basis for the damages to the upstairs of the rental unit and for the various broken items. While Plaintiffs have not provided a specific dollar amount, Eric Thorp testified that he has expended $20,000 specifically for repairs and replacement of items on the first floor The Court finds this to be a credible figure of Plaintiffs' damages beyond normal wear and tear and awards $20,000 for such damages. Along with the fuel oil award, this brings Plaintiffs' damage award to $20,500.

*Attorney's Fees*

Plaintiffs also seek attorney's fees pursuant to their lease agreements with Defendant. 12 V.S.A. § 4854 (allowing attorney's fees pursuant to a lease agreement); see also *Ring v. Carriage House Condominium Owners' Ass'n*, 2014 VT 127, ¶ 19. Counsel for Plaintiff testified that he put 46.8 hours of work into the present matter at an hourly rate of $300 for a total attorney's fee of $14,040. The present case was initially filed in December 2023 and continued through March of 2025. There were multiple motions in the case, including two rent escrow motions, two motions to dismiss, amended complaints, and several motions to continue. The parties engaged in extensive negotiations, and there were multiple in-person/hybrid hearings where evidence and testimony was sought and produced. While elements of this action follow the pattern of a landlord-tenant ejectment action, the record indicates that this was a vigorously contested matter with both sides filing legal briefs and providing evidence and testimony on nearly every substantive and procedural juncture in this matter.

## Legal Analysis

*Unpaid Rent and Damages*

The bulk of Plaintiffs' claims are relatively straightforward. Under 12 V.S.A. § 4854 and 9 V.S.A. § § 4455, 4456, and 4468, a landlord may recover any damages due and owing under the lease agreement or incurred by the negligent actions of the tenant. In this case, Defendant did not pay her rent for nine months that she lived in and occupied the dwelling unit. Landlord is entitled to the unpaid rent for these months at the noticed monthly rate of rent of $2,300. Thus, Plaintiffs are entitled to $20,700 in unpaid rent. The Court also finds that Defendant failed to re-fill the fuel tank to the level that she received. As a result, Plaintiffs had to fill the tank and incurred $500 in costs to which they may claim as damages. Finally, Plaintiffs have established damages beyond normal wear and tear in the amount of $20,000. The Court awards this amount for total damages of $41,200.

*Late Fees*

The Court is obligated to scrutinize any request to late fees pursuant to a lease agreement to determine if they are liquidated damages or an illegal penalty for late payment. *Highgate Associates, Ltd. v. Merryfield*, 157 Vt. 313, 315–16 (1991). A valid liquidated damages clause must meet three criteria for a Court to impose the penalty. They include:

1. because of the nature or subject matter of the agreement, damages arising from a breach would be difficult to calculate accurately;
2. the sum fixed as liquidated damages must reflect a reasonable estimate of likely damages; and
3. the provision must be intended solely to compensate the nonbreaching party and not as a penalty for breach or as an incentive to perform.

Id. (quoting *New England Educational Training Service, Inc. v. Silver Street Partnership*, 156 Vt. 604, 613 (1991)).

In this case, Plaintiffs admit that the 10% late fee does not correspond to any particular damage or cost to them, but represents an incentive, and effectively a penalty, to compel timely payments. Plaintiffs admit that there are no damages to them for late payment apart from the loss of the payment itself. The 10% rate for the late fee does not calculate the loss of a timely monthly payment to the prevailing interest rate. Under *Highgate Associates*, such a provision constitutes an illegal penalty and is unenforceable. 157 Vt. at 317–18. As such, the Court denies Plaintiffs' request for late fees in this case.

*Attorney's Fees*

Plaintiffs are entitled to their attorney's fees under both 9 V.S.A. § 4456 and 12 V.S.A. § 4854, which allow for attorney's fees. The Court finds that the provisions of the parties' leases included a provision for attorney's fees. While Defendant refused to sign the 2023 proposed lease, she remained subject to the prior lease terms. See *Maniatty v. Carroll Co.*, 114 Vt. 168, 169 (1945) (explaining that when a tenant holds over from a prior

lease with the consent of the landlord, the terms and conditions of the original lease carry over).  In this case, notwithstanding Defendants refusal to sign the new lease, she remained on the property, Plaintiffs did not immediately move to evict, and Ms. Moonstone continued to pay rent at the terms noticed and agreed by the parties.  The Court finds that Defendant held over subject to the terms of the prior leases, which included provisions for attorney's fees.  Therefore, Section 4 of the 2022 lease is enforceable against Defendant for reasonable attorney's fees associated with the eviction.

In determining the reasonableness of a fee award, the Court begins with the so-called "lodestar figure," which is the number of hours reasonably expended on the case multiplied by a reasonable hourly rate.  *L'Esperance v. Benware*, 2003 VT 43, ¶ 22; see also *Ring*, 2014 VT 127, at ¶ ¶ 20–21.  This concept arises from United States Supreme Court case law that dictates that a Court reviewing a request for attorney's fees should begin its analysis by first looking at the number of hours expended by the prevailing party and established through documentation.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The Court should then exclude from this initial calculation any hours that were "not reasonably expended" on the case.  Id.  The Supreme Court explains that this can include situations where the case is overstaffed, where the hours are redundant, where the excess billing may be the result of differing attorney skill, and other elements that go into what is often called "billing judgment" in the private sector.  Id.

In making this analysis, the Court is guided by the demands of the case and not necessarily the amount of the damages. The Vermont Supreme Court has expressly rejected that approach to attorney's fees, and it has affirmed attorney's fee awards that have exceeded the underlying damages by as much as 86%. *Vastano v. Killington Valley Real Estate*, 2010 VT 12, ¶ 9 (awarding $55,012 in attorney's fees after a $7,875 award of damages); see also *Kwon v. Eaton*, 2010 VT 73, ¶ 20 (re-affirming the holding of *Vastano* and its successor cases).

After making this initial calculation, the Court may then adjust the amount upwards or downwards based on the circumstances of the case and factors including: 1) the novelty of the legal issue; 2) the experience of the attorney; and 3) the results obtained by the litigation. *L'Esperance*, 2003 VT 43, at ¶ 22. Of these factors, *Hensley* holds that the most important is the third. *Hensley*, 461 U.S. at 434. This may be broken down into an analysis of whether the plaintiff failed to prevail on part of its claims and did the plaintiff achieve the "level of success that makes the hours reasonably expended in a satisfactory basis for making a fee award . . . ." Id. This does not mean that an attorney's fee is reduced simply because the plaintiff did not prevail on every contention raised in the lawsuit—particularly if those contentions were made in the alternative or go beyond what the court had to decide. Id at 435. "There is no precise rule or formula for making these determinations." Id. at 436. The trial court is given wide discretion in making these determinations. *L'Esperance*, 2003 VT 43, at ¶ 21.

In this case, the Court finds that the 46.8 hours of attorney time is reasonable based on the amount of work required to litigate the present case. The Court finds that the $300 per hour rate is consistent with an experienced civil litigator in this area. Therefore, the Court finds that Plaintiff's proposed amount is consistent with the lodestar for this type of action.

The next question is whether the specific factors under *L'Esperance* warrant an increase or decrease in this amount. None of the factors warrant either an increase or decrease. Despite the length of the litigation, the current action involved no novel areas of law. There was no special experience that Attorney Teachout brought to this case— just good civil litigation skills. The results obtained by the litigation also do not warrant a shift in the lodestar. Plaintiffs succeeded in removing Defendant from the dwelling unit and have proven several claims for damages, but they did not succeed on several major claims, including damages to the basement and to the deck. While the Court finds Plaintiffs to be the prevailing party, the result has some mixed elements. As such, the factor warrants neither an increase nor decrease. In particular, the Court does not find that Plaintiffs' success claims and the legal work behind them can be separated from the unsuccessful portions of the case. Attorney Teachout's billing indicates a more uniform whole in which the costs of litigation arose from the basic elements of the claim, providing timely notice, filing the complaint, replying and objecting to motions, and to preparing for hearings. These expenses are neither increased nor diminished by the

outcome and results of the case. They are proportionate to the needs of the case, and the Court finds them reasonable.

For these reasons, the Court finds that Plaintiffs' attorney's fees are reasonable at the amount sought by Attorney Teachout, and they are awarded in full in the amount of $14,040.

## ORDER

Based on the foregoing, it is ordered and adjudged that Plaintiffs Eric and Lynn Thorp shall have judgment against Defendant Vanilla-Clove Moonstone in the amount of $41,200 in damages and $14,040 in attorney's fees. The right of possession has previously been awarded to Plaintiffs in a prior order and writ of possession is affirmed again here. Plaintiffs are further awarded their costs in the amount of $623.48 for filings fees and service costs. V.R.C.P. 54(d). The Court awards a total, final judgment of $55,863.48.

Electronically signed on 5/28/2025 1:10 PM pursuant to V.R.E.F. 9(d)

Daniel Richardson
Superior Court Judge

Vermont Superior Court
Filed 05/29/25
Orange Unit

Joyce E. Mc Keeman
Assistant Judge

The Hon Laurel Mackin
Assistant Judge